M. LAURENCE POPOFSKY (No. 33946)
STEPHEN V. BOMSE (No. 40686)
SCOTT A. WESTRICH (No. 172442)
NINA ANNE M. GREELEY (No. 197449)
HELLER EHRMAN WHITE & McAULIFFE LLP
333 Bush Street
San Francisco, CA  94104-2878
Telephone: (415) 772-6000
Facsimile: (415) 772-6268

Attorneys for Plaintiff
VISA U.S.A. INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VISA U.S.A. INC., a Delaware corporation,<br><br>                                    Plaintiffs,<br><br>        v.<br><br>FIRST DATA CORPORATION, a Delaware corporation, FIRST DATA RESOURCES, INC., a Delaware corporation, and FIRST DATA MERCHANT SERVICES CORPORATION, a Florida corporation,<br><br>                                    Defendants. | Case No.:<br><br>COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES FOR (1) DECLARATORY RELIEF; (2) FEDERAL TRADEMARK INFRINGEMENT; (3) FEDERAL TRADEMARK DILUTION; (4) FALSE DESIGNATION OF ORIGIN AND FALSE IMPRESSION OF ASSOCIATION; (5) ANTICIPATORY BREACH OF CONTRACT; (6) BREACH OF CONTRACT; AND (7) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING. |

## INTRODUCTORY STATEMENT

1.      This is an action by Visa U.S.A. Inc. ("Visa") against First Data Corporation, First Data Resources, Inc., and First Data Merchant Services Corporation (collectively, "First Data") for trademark infringement, trademark dilution, false designation of origin and false impression of association, anticipatory breach of contract, breach of contract, breach of the covenant of good faith and fair dealing and declaratory relief.  Visa is a Delaware membership corporation that licenses its thousands of financial institution members to issue general purpose payment cards and to enroll merchants to accept those cards as payment for goods and services.  The federally registered Visa word mark and its associated blue, white and gold bands design mark are among the most famous and valuable marks in the United States.

2.      Visa has successfully created an enormously valuable and well known brand of general purpose payment cards.  Among other things, VISA cards are known to consumers and merchants as a reliable and widely accepted form of payment.  Holders of VISA cards know that wherever they see the VISA flag—the ubiquitous blue, white and gold bands design that appears in the windows of millions of merchants around the world— they are assured of a speedy and secure method of payment.  Visa's members offer U.S. consumers thousands of different VISA payment cards with different features and services, including airline miles programs and affinity cards.  Indeed, the convenience, flexibility and reliability of the Visa payment card system has become a part of everyday life for consumers.  On the merchant side, if a customer pays with a VISA brand card and the merchant follows Visa's acceptance procedures, the merchant is assured of prompt payment for that transaction.

3.      Visa also is valued by its members for its strong brand image and reputation among consumers as well as for its efficient and sophisticated processing systems, innovative product platforms and other support services.

4.      Visa consistently updates and improves its systems' ability to provide speedy and reliable processing of transactions at a uniform level of quality, while guarding

1

against fraud and other risks to the system.  Risks posed by the growing use of the internet by consumers has intensified the need for these efforts.

5.   This case involves an effort by First Data to bypass Visa's systems in authorizing, clearing and settling Visa transactions.  First Data's actions not only violate the terms of its contracts with Visa and jeopardize the safety, efficiency and consistency that consumers, merchants and Visa members themselves have come to expect from Visa, but also infringe Visa's trademarks and threaten to dilute the value of Visa's brand.

### JURISDICTION AND INTRADISTRICT ASSIGNMENT

6.   The Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1338(a) and 1331 in that they arise under the trademark laws of the United States, 15 U.S.C. §§ 1051 *et seq.*  The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. §§ 1338(b) and 1367 in that those claims are joined with substantial and related claims under federal law and under the principles of supplemental jurisdiction.

7.   First Data transacts business and is found within this district.  Visa alleges on information and belief that First Data provides payment card processing services to Visa members located in this district and that First Data has merchant relationships within this district.  First Data maintains systematic and continuous contacts with this district.

8.   Venue is proper in this court under 28 U.S.C. § 1391(c).  Assignment to the San Francisco Division of this Court is appropriate because a substantial portion of the events giving rise to this litigation occurred in San Francisco, California or Foster City, California (San Mateo County).

### THE PARTIES

9.   Visa is a Delaware membership corporation with its principal place of business in San Francisco, California.  It also maintains significant operations in Foster City, California.  Visa's members consist of thousands of financial institutions, including commercial banks, savings banks, savings and loan associations and credit unions.

10.   First Data Corporation is a Delaware Corporation with its principal

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

place of business in Greenwood Village, Colorado.  First Data Corporation's wholly owned subsidiary First Data Resources, Inc., which is a Delaware corporation with its principal place of business in Omaha, Nebraska, provides processing services for Visa member financial institutions related to the issuing of credit cards and the servicing of cardholder accounts (*e.g.*, preparation of cardholder billing statements, handling of cardholder inquiries and authorization of Visa card transactions).  First Data Merchant Services Corporation, another wholly owned subsidiary of First Data Corporation, is incorporated in Florida, has its principal place of business in Greenwood Village, Colorado, and provides processing services for Visa member financial institutions relating to merchant solicitation, acquiring and processing.

## THE VISA MARKS

11.     Visa is a group member of Visa International Service Association ("Visa International").  Visa International is an international membership organization incorporated under the laws of the State of Delaware with its principal place of business in Foster City, California.  Visa International owns the marks used in connection with the Visa payment card system.  The marks include, among others, the word mark "VISA"; a design mark consisting of horizontal blue, white and gold bands; a composite design mark consisting of the word mark VISA within the blue, white and gold bands design; and a design mark consisting of a dove in flight.  These marks and all of Visa's other federally registered and pending marks are collectively referred to as the "VISA marks."

12.     Visa International, Visa and its member banks have used the VISA marks in connection with VISA brand payment cards since at least 1976.  Visa International has sought and obtained numerous federal registrations for the VISA marks in accordance with the provisions of the Lanham Act.  The registrations include VISA, VISA ONLINE, VISANET, and many others.  Visa's registrations are valid and subsisting and are incontestable under Section 15 of the Lanham Act, 15 U.S.C. § 1065.

13.     Visa International has licensed Visa and its members to use and license the VISA marks in the United States.  Visa International has granted Visa the right to

enforce the VISA marks in the United States with respect to First Data's Private Arrangement application and the subject of this complaint.

14.     Visa International, Visa and Visa's members have devoted substantial time, effort and money to developing the Visa joint venture and promoting the VISA marks. Through these efforts, the VISA marks have become well known and highly respected and have acquired enormous goodwill.  Processors and other service providers such as First Data display the VISA marks to indicate that they are authorized by Visa to perform processing services for VISA transactions.  The VISA marks distinguish Visa and its members' products and services from those of their competitors.

## THE VISA PAYMENT CARD SYSTEM

15.     Visa's member financial institutions are authorized by Visa's By-laws, Operating Regulations, and other relevant rules and regulations (referred to collectively as "Visa's Rules") to enter into contractual relationships with cardholders and/or with merchants who accept VISA cards as payment for goods and services.

16.     The parties to a VISA transaction include (a) the cardholder who uses his or her VISA card to purchase goods or services; (b) the merchant from whom the purchase is made; (c) the merchant's bank or other financial institution (known as the "acquiring bank" or "acquirer"); and (d) the financial institution that issued the VISA card to the consumer (known as the "issuing bank" or the "issuer").  The issuer and the acquirer for a given transaction may be the same financial institution but very often that is not the case.

17.     In a typical VISA transaction, a cardholder gives the merchant her VISA card for payment and the merchant passes the card through the payment card terminal located in the store.  The transaction information is sent from the merchant to the merchant's acquiring bank, which puts the data into the appropriate format and sends that data to Visa.  Visa then determines which member issued the cardholder's VISA card and forwards the transaction data to that issuer for authorization.  The authorization decision (approve or decline) is transmitted first from the issuer to Visa and then from Visa to the

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

merchant acquirer and finally to the merchant, where the card will be accepted or rejected for payment at the point of sale.  The authorization process for a VISA card transaction is typically completed in a matter of seconds.  If the transaction is authorized, the merchant sends the transaction information to the acquirer for payment according to the terms of the merchant's contract with the acquirer.  The acquirer then forwards the transaction data to Visa for Visa to send to the appropriate issuer.  The issuer then will post the transaction to the cardholder's account and bill the cardholder for the purchase in the cardholder's monthly statement.  In the meantime, Visa clears and settles between the issuer and the acquirer, with the issuer paying the amount of the transaction to the acquirer less any relevant system fees (known as "interchange") and assures that the entire Visa system balances to zero on a daily basis.

18.     Visa permits its members to authorize agents to perform either the issuing or acquiring functions for them, subject to the restrictions and requirements set forth in Visa's Rules.  Many of Visa's members outsource their processing activities to third party processors such as First Data, who perform processing for VISA transactions as agents of Visa's members.  First Data and other third party processors offer services including account management (*e.g.*, generating and mailing monthly statements to cardholders), merchant-related functions (*e.g.*, merchant signing and settlement of merchant accounts), and other payment card support programs.  Visa's members determine which services they want to obtain from third party processors (subject to any restrictions in Visa's Rules).  First Data and other third party processors provide some or all of these same services to competing payment card systems, such as MasterCard.

19.     The extent of a third party processor's involvement with any particular transaction is governed by the processor's agency agreement(s), if any, with the acquiring bank and the issuing bank for that transaction.  Furthermore, Visa's members and their agents are required to comply with all of Visa's relevant rules and regulations, including the provisions of Visa's Operating Regulations.

20.     Visa has separately entered into direct contractual agreements with

certain third-party processors, including First Data Resources, Inc. and First Data Merchant

Services, and those processors must, of course, abide by the terms of those agreements.

Specifically, Visa has entered into a "VisaNet Letter of Agreement" with both First Data

Resources, Inc. and First Data Merchant Services.  The most recent of these contracts were

executed in September 2001, and they are attached hereto as Exhibit A.  Under the terms of

these agreements, First Data Resources, Inc. and First Data Merchant Services stipulated

and agreed, among other things, that:

> 1.      We are the agent of each Member for which we provide Services under
> this *VisaNet Letter Agreement* ("Agreement").  We understand and
> acknowledge that we have no right to use your [Visa's] Systems or to
> otherwise provides Services to a Member pursuant to this Agreement or
> otherwise unless the Member has registered us with you as the Member's
> agent pursuant to your Operating Regulations. . . .
>
> 2.      Your consent to our use of your Systems to provide Services to
> Members is subject to our continued compliance with all of the obligations of
> Member(s) and their agents relating to those systems set forth in your By-
> laws, Operating Regulations, Manuals or other written documentation
> ("Rules"), as amended from time to time, and the terms of this Agreement.
> We hereby acknowledge receipt of a copy of your Rules and acknowledge
> that it is our responsibility to read and understand the Rules.  We also agree to
> monitor and comply with all amendments to the Rules.

## <u>PRESERVATION OF THE VISA MARKS</u>

21.      Visa International licenses the use of the VISA marks to Visa and its

members.  Visa's members and their agents may use the VISA marks only if they comply

fully with Visa's Rules.  For example, Chapter 1.7.A.2.a of Volume I of Visa's Operating

Regulations states that "[a]ll use of the Visa-Owned Marks, as well as the nature and quality

of all services rendered under these Marks, must comply with the *Visa International*

*Operating Regulations* and *Visa U.S.A. Inc. Operating Regulations*."

22.      First Data has no right to use the VISA marks except as an agent of a

Visa member and pursuant to the terms of its contracts with Visa.

23.      According to Volume I of Visa's Operating Regulations, Chapter

1.7.A.1.e, "[e]ach Member must cooperate with Visa to ensure protection of each of the

Visa-Owned Marks."  The Operating Regulations prohibit member banks from, among

other things, infringing, diluting or denigrating the VISA marks or from using the marks in a confusing, misleading or deceptive manner.  Volume I of Visa's Operating Regulations, Chapter 1.7.A.1.f, provides in relevant part that no member materials using any VISA mark shall:

> contain any matter which would tend to infringe, dilute, or denigrate any of the Visa-owned Marks, Visa Products, Visa services, or any Member or Merchant, or impair the reputation or goodwill of Visa or the goodwill associated with the Marks.  No Member shall adopt any Mark or market, either directly or indirectly, any Visa Product or service, to consumers, Merchants or other Members in a manner which has the likely effect of confusing, misleading, defrauding or deceiving such consumers, Merchants or Members, either as to the program, product or service, or the source, affiliation, sponsorship or association of such program, product or service. . . .

24.     In addition to these and other relevant Operating Regulations, Visa's contracts with First Data expressly provide that Visa has the right to deny any agent access to its systems if Visa deems that the agent is acting "in a manner which threatens to damage the goodwill of [its] Members or the Visa system."

## FACTS GIVING RISE TO THIS DISPUTE

25.     This dispute relates to First Data's application to Visa to begin a so-called Private Arrangement and to Visa's rules relating to such arrangements.  A "Private Arrangement" is defined in Visa's Operating Regulations as an "agreement where Authorization Requests and Transactions involving two different Members are not processed through VisaNet."  VisaNet refers to Visa's internal processing system that performs the (a) authorization and (b) clearing and settlement functions as described above in paragraph 17.  Thus, a Private Arrangement is one in which either the authorization function or the clearing and settlement function is not routed through Visa.

26.     Visa's Operating Regulations do not bar Private Arrangements if certain conditions are met and Visa approves the arrangement.  Volume I of Visa's Operating Regulations, Chapter 6.2.I.1.b, provides that a processor seeking to engage in a Private Arrangement must submit a completed Notification of Private Arrangement, also known as "Exhibit FF," at least 120 days prior to the proposed effective date of the Private Arrangement.  This rule applies to all Private Arrangements, regardless of their size, and

there are no exceptions to this requirement set forth in Visa's Operating Regulations.

27.    The Exhibit FF form, which is thus incorporated by reference into Visa's Operating Regulations, by its terms "serves as notice that the [applicant] intends to enter into a Private Arrangement, as defined in the Operating Regulations, for the processing of Visa Transactions and *seeks the approval of Visa U.S.A., Inc. before commencing the arrangement*."  (Emphasis added.)  The Exhibit FF form asks the applicant for certain information concerning the proposed Private Arrangement, including the date on which the applicant intends to commence the arrangement.  The form must be signed by an appropriate officer of the applicant, who in doing so expressly acknowledges that "*[i]f this arrangement is approved by Visa U.S.A.* . . . all transactions involved will be processed under the conditions that are stated in the appropriate *VisaNet User's Manual* and these Operating Regulations."  (Emphasis added.)

28.    Visa's Operating Regulations also provide, among other things, that Visa may request additional information about the proposed Private Arrangement in addition to the information provided in the Exhibit FF and that the clearing processor must comply with the appropriate Private Arrangement requirements set forth in Visa's Operating Regulations, the VisaNet User's Manual and other relevant documents.

29.    Visa's Rules relating to Private Arrangements are intended to protect against harm to Visa, its members, cardholders and merchants.  Private Arrangements pose significant system and brand concerns for Visa because when transactions are authorized, cleared and/or settled via a Private Arrangement, and not through Visa's systems, the following questions, among others, are raised:  whether Visa will be able to maintain the sophisticated fraud and risk management programs it currently uses and offers to members; whether the incidence of "chargebacks" (that is, a transaction that the issuer returns to the acquirer for any number of reasons, from non-receipt of merchandize to fraudulent transactions) would rise for transactions within the Private Arrangement; whether the Private Arrangement will detrimentally affect Visa's ability to manage the interchange function; and whether the Private Arrangement will affect Visa's ability to introduce new

products and services for members, cardholders and merchants.

30.     The 120-day notice requirement in the Operating Regulations is intended to allow Visa to gather enough information about the proposed Private Arrangement to determine the extent to which the proposed Private Arrangement poses risks to or imposes costs on Visa, its brand, its members, its cardholders or its merchants. Based on this analysis Visa will decide whether the proposed Private Arrangement should be allowed to proceed as proposed, whether it should be allowed to proceed only if certain conditions are met, or whether it should not be allowed to proceed at all.  In some cases, Visa may not be able to complete this analysis within 120 days and may need additional time to respond definitively to the Private Arrangement application.

31.     Sometime in January 2002, First Data Merchant Services and First Data Resources, Inc. notified Visa by separate Exhibit FFs that they wished to engage in a Private Arrangement commencing in March 2002.  According to the applications, the proposed Private Arrangement would involve clearing and settlement but not authorization. The applications did not provide sufficient information for Visa to determine which issuing and acquiring members' transactions would be included with the proposed Private Arrangement.

32.     In response to these Exhibit FFs, Visa separately wrote First Data Merchant Services and First Data Resources, Inc. on January 24, 2002, informing them that their respective Exhibit FFs did not comply with the 120-day notice requirement and that Visa was unable to determine from the information provided whether the Private Arrangement, if implemented, "would meet our service quality and risk standards."  Visa further informed First Data that it would need to provide Visa with satisfactory answers to a number of questions "to ensure that this Private Arrangement does not compromise the quality or performance of the Visa service."  Visa indicated that it would forward a list of questions to First Data at a later time, but that First Data should assume that its request to commence a Private Arrangement in March 2002 "cannot be accommodated."

33.     On February 13, 2002, Visa forwarded to First Data a list of questions

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

and issues that it wanted to discuss with First Data concerning the proposed Private Arrangement.  In this correspondence, Visa indicated that the "unique nature of this proposal raises a number of issues that require detailed operational review and testing to identify and evaluate the impact on current Visa systems, performance standards, operating procedures, and compliance with financial safety and soundness requirements.  Based upon the outcome of future testing and evaluation, Visa reserves the right to impose further conditions on the operation of the proposed private arrangement."

34.    On March 1, 2002, Visa received two new Exhibit FFs (the "March Exhibit FFs") (attached hereto as Exhibit B) from First Data, which were apparently intended to replace or supersede the prior applications.  These applications were sent on behalf of First Data Resources, Inc. and Banc One Corporation, respectively (although the latter was signed by an officer of First Data Merchant Services as attorney in fact), and they describe a different proposed Private Arrangement than the undated January notification.  Specifically, the new proposal involves an authorization function and a clearing and settlement function, and appears to cover more potential transactions.  However, as with the first application, the March Exhibit FFs do not provide enough information for Visa to determine which transactions would be involved.

35.    The March Exhibit FFs indicate that the proposed Private Arrangement would commence in June 2002.  The attachments to the Exhibit FFs further clarify that a portion of the arrangement would begin on June 3, 2002, and the remainder on June 22, 2002.  These dates, on their face, violate Visa's 120-day minimum notification requirement, which has not been waived by Visa.

36.    Furthermore, in its response to Visa's questions sent concurrently with the Exhibit FFs, First Data stated that it "intends to conduct a limited pilot (commencing March 3[, 2002]) prior to the indicated start date . . . ."  This so-called "pilot" clearly violates the notice requirement, since it was to begin only two days after Visa was notified.  In a letter dated March 1, 2002, Visa informed First Data that its proposed "pilot" violated Visa's Rules and that First Data did not have Visa's permission to proceed with the "pilot."

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

37.     Subsequently, on March 4, 2002, First Data confirmed in writing its earlier oral representation that it would not launch its "pilot" on March 3, but would only delay the "pilot" one week.  In this letter First Data refused to acknowledge any need to comply with Visa's Operating Regulations or to obtain Visa's approval before commencing a Private Arrangement.  After further discussions with Visa, First Data subsequently agreed not to commence its Private Arrangement "pilot" until April 15, 2002, although Visa did not give First Data its permission to proceed with the "pilot" at that time.

38.     On March 29, 2002, First Data again wrote Visa and stated that it did not need Visa's prior approval to proceed with the "pilot" or the proposed Private Arrangement.  First Data stated that it had submitted the March Exhibit FFs only "as a courtesy and in the spirit of full and open communication," and that it "[does] not believe [an FF filing] is required based on course of dealing and the circumstances described above."  Finally, in the March 29 letter, First Data reiterated its plan to begin the "pilot" on April 15, 2002, apparently with or without Visa's authorization.

39.     Visa responded to this letter on April 4, 2002, and reminded First Data that it could not begin any Private Arrangement, including its "pilot," without Visa's prior approval and, in any event, without providing Visa at least 120 days notice.  Visa also told First Data that in the following week it would provide a definitive response "regarding whether FDC may proceed with the pilot and, if so, what conditions Visa might impose on the pilot in order to protect the VISA system and brand."  The letter also pointed out that First Data had failed to provide Visa with requested information about the proposed Private Arrangement.  For example, First Data has failed to provide Visa with a list of members whose transactions would be cleared in the "pilot" and the proposed Private Arrangement despite numerous requests from Visa for this information.

40.     On April 9, 2002, Visa informed First Data that it would allow First Data to proceed with its "pilot" subject to certain conditions aimed at safeguarding the integrity of the processing and the VISA marks:

- "The pilot will be of 30 days duration absent written consent by Visa U.S.A. to an extension."
- "The pilot will be limited to no more than 3500 clearing and settlement transactions daily."
- "FDC will provide Visa U.S.A. with a copy of the written, informed consent of each Visa U.S.A. Member participating in the pilot as well as the name of each such Member."
- "Visa U.S.A. will have the right to audit compliance with Visa Operating rules and regulations such as interchange compliance and dispute resolution and for purposes of evaluating service quality."
- "FDC must have adequate capability to back-up all transactions in the pilot; it must provide Visa with assurance that it has this capability and a description of it; and this back-up procedure must be approved by Visa."

A copy of Visa's letter is attached at Exhibit C.

41.      First Data informed Visa by letter dated April 12, 2002, that it would not comply with these conditions, but that it would proceed with its "pilot" nonetheless on April 15, 2002.  A copy of that letter is attached as Exhibit D.  First, First Data wrote that it would not agree to limit the duration of the test period because it did not view that condition to be "commercially reasonable."  Second, First Data still has not provided Visa assurances that it has adequate back-up capability and procedures in place and, in any event, has not given Visa an opportunity to approve its back-up plans.  The information provided in First Data's letter and in prior meetings between First Data and Visa is insufficiently detailed for Visa to evaluate its adequacy, particularly in light of First Data's continued refusal to identify the Visa members whose accounts would be affected by the "pilot."  If anything, First Data's letter suggests that it does not have adequate back-up plans in place.  Third, First Data also has not provided Visa with copies of its members' written consent to participate in the "pilot," although it claims that it will provide Visa with evidence of consent *after* it proceeds with the "pilot" on April 15, 2002.  In its words, "[w]e expect to

proceed with our test on April 15th with customers who have agreed to participate." Finally, First Data has not affirmatively represented that it will abide by the other conditions set forth in Visa's April 9, 2002 letter. First Data has not retracted any of the statements in its April 12, 2002 letter.

42.    First Data's decision to proceed with the Private Arrangement "pilot" without Visa's approval and without providing Visa with 120 days notice violates Visa's Operating Regulations and is a breach of its contractual obligations to Visa.

43.    First Data's repudiation of its obligations under Visa's Operating Regulations and its contracts with Visa with respect to the "pilot," its failure to provide Visa with information that Visa has requested concerning the proposed Private Arrangement, and its continued insistence that it does not need Visa's approval before proceeding with the Private Arrangement, all strongly suggest that First Data also will not abide by Visa's decisions with respect to the proposed Private Arrangement.

**FIRST CLAIM**
**DECLARATORY RELIEF**

44.    An actual controversy has arisen and now exists between the parties relating to the legal rights and duties of First Data and Visa for which Visa desires a declaration of rights. A declaratory judgment is necessary in that Visa contends, and First Data denies, that First Data's actions and its threatened actions do and would constitute violations of its contractual obligations to Visa.

45.    Specifically, First Data denies that it must comply with Visa's Rules concerning Private Arrangements before it commences its Private Arrangement "pilot" or the Private Arrangement it has said it will launch in June 2002. In particular, First Data denies that it must (a) provide Visa with at least 120 days notice and (b) obtain Visa's prior approval before commencing a Private Arrangement.

**SECOND CLAIM**
**FEDERAL TRADEMARK INFRINGEMENT**

46.    Visa alleges infringement of the federally registered VISA marks under

the provisions of the Lanham Act, 15 U.S.C. § 1114.  The allegations in paragraphs 1 through 45 are incorporated by reference herein.

47.     Visa's Operating Regulations, including but not limited to Operating Regulations, Volume I, Chapter 1.7.A.2.a, expressly condition use of the VISA marks on full compliance with the Operating Regulations.  As an agent of certain Visa members who are licensed to use the VISA marks, First Data has infringed, and continues to infringe, the VISA marks within the meaning of 15 U.S.C. § 1114 when it holds itself out to Visa members, merchants and cardholders as a genuine or authorized processor of Visa transactions, and when it processes Visa transactions, while at the same time knowingly violating Visa's Operating Regulations and its contractual obligations to Visa.

48.     Because First Data has proceeded with its "pilot" without complying with the conditions that Visa has imposed on that arrangement, and may proceed with the proposed Private Arrangement without Visa's approval or without complying with the conditions that Visa may impose on that arrangement, Visa is not able to ensure that the Visa transactions that are authorized, cleared and settled via First Data's Private Arrangement meet Visa's quality control requirements.  Despite Visa's inability to monitor the quality of the servicing and processing for those transactions, it is likely that Visa's cardholders, merchants and/or members will be confused or misled into believing that Visa has monitored and approved the quality and genuineness of the services and processing of those transactions.

49.     First Data's wrongful conduct has caused and continues to cause great and irreparable injury to Visa.  Visa has no adequate remedy at law for the injuries it is currently suffering and will continue to suffer.  Unless First Data is enjoined from continuing and/or commencing any Private Arrangement, as that term is defined in Visa's Operating Regulations, without (a) complying with Visa's Rules, (b) obtaining Visa's prior approval, and (c) complying with any conditions that Visa might place on that Private Arrangement, First Data will further diminish the value of the VISA marks and erode the goodwill that Visa and its members have worked to foster in the VISA marks.  The amount

of such injury is difficult to calculate but could amount to many millions of dollars over time.

### THIRD CLAIM
### FEDERAL TRADEMARK DILUTION

50.     Visa alleges dilution of the federally registered VISA marks under the provisions of the Lanham Act, 15 U.S.C. § 1125(c).  The allegations of paragraphs 1 through 49 are incorporated herein.

51.     First Data's proposed Private Arrangement has diluted, tarnished, blurred and denigrated the famous VISA marks within the meaning of 15 U.S.C. § 1125(c) and will continue to do so.

52.     First Data has informed Visa that it will proceed with its "pilot" without Visa's approval and without abiding by Visa's Rules and its contractual obligations to Visa.  First Data also has strongly indicated that it will do the same in connection with the Private Arrangement that it intends to commence in June 2002.  For these reasons, Visa is informed and believes, and on that basis alleges, that First Data willfully intends to trade on Visa's reputation and to diminish the capacity of VISA's marks to identify and distinguish Visa's services, thereby causing dilution, tarnishment, blurring and denigration of VISA's marks.

53.     First Data's wrongful conduct has caused and continues to cause great and irreparable injury to Visa.  Visa has no adequate remedy at law for the injuries it is currently suffering and will continue to suffer.  Unless enjoined, First Data will further diminish the value of the VISA marks and erode the goodwill that Visa and its members have worked to foster in the VISA marks.  The amount of such injury is difficult to calculate but could amount to many millions of dollars over time.

### FOURTH CLAIM
### FALSE DESIGNATION OF ORIGIN AND FALSE
### IMPRESSION OF ASSOCIATION

54.     Visa alleges false designation of origin and false impression of association of the federally registered VISA marks under the provisions of the Lanham Act,

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

15 U.S.C. § 1125(a).  The allegations of paragraphs 1 through 53 are incorporated herein.

55.     First Data's actions have created and will create a false impression of association and false designation of origin within the meaning of 15 U.S.C. § 1125(a) that Visa is performing genuine authorization, clearing, settlement and other system functions for transactions within the Private Arrangement or that First Data is authorized by Visa to perform such functions.

56.     First Data's wrongful conduct has caused and continues to cause great and irreparable injury to Visa.  Visa has no adequate remedy at law for the injuries it is currently suffering and will continue to suffer.  Unless enjoined, First Data will further diminish the value of the VISA marks and erode the goodwill that Visa and its members have worked to foster in the VISA marks.  The amount of such injury is difficult to calculate but could amount to many millions of dollars over time.

### FIFTH CLAIM
### ANTICIPATORY BREACH OF CONTRACT

57.     Visa alleges anticipatory breach of contract under California Civil Code § 1440.  The allegations of paragraphs 1 through 56 are incorporated herein.

58.     Visa entered into Letters of Agreement with First Data Resources, Inc. and First Data Merchant Services.  The most recent of these contracts were executed in September 2001.  These agreements require First Data to comply with Visa's Operating Regulations, among other things.  In addition, as the agent of Visa members, First Data must comply with Visa's Operating Regulations and other relevant rules and regulations.  As described above, First Data has refused to comply with Visa's Operating Regulations concerning Private Arrangements and has stated that it will commence a Private Arrangement "pilot" on April 15, 2002 without Visa's permission and without meeting the conditions that Visa placed on that arrangement.

59.     First Data also has stated that it will begin a Private Arrangement in June 2002, and has denied that it needs to obtain Visa's permission or that it needs to comply with Visa's Rules before commencing that Private Arrangement.  First Data has

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

effectively repudiated its contractual obligations with respect to its proposed June 2002 Private Arrangement just as it has for the "pilot" and has not retracted that repudiation.

60.    First Data's wrongful conduct has caused and continues to cause great and irreparable injury to Visa. Visa has no adequate remedy at law for the injuries it is currently suffering and will continue to suffer. Unless enjoined, First Data will further diminish the value of the VISA marks and erode the goodwill that Visa and its members have worked to foster in the VISA marks. The amount of such injury is difficult to calculate but could amount to many millions of dollars over time.

**SIXTH CLAIM**
**BREACH OF CONTRACT**

61.    Visa alleges breach of contract. The allegations of paragraphs 1 through 60 are incorporated herein.

62.    First Data has refused to comply with Visa's Operating Regulations concerning Private Arrangements and has commenced a Private Arrangement without Visa's permission and without meeting the conditions that Visa placed on that arrangement. As a consequence, First Data has breached its contractual obligations to Visa.

63.    First Data's wrongful conduct has caused and continues to cause great and irreparable injury to Visa. Visa has no adequate remedy at law for the injuries it is currently suffering and will continue to suffer. Unless enjoined, First Data will further diminish the value of the VISA marks and erode the goodwill that Visa and its members have worked to foster in the VISA marks. The amount of such injury is difficult to calculate but could amount to many millions of dollars over time.

**SEVENTH CLAIM**
**BREACH OF THE COVENANT OF GOOD**
**FAITH AND FAIR DEALING**

64.    Visa alleges breach of the covenant of good faith and fair dealing. The allegations of paragraphs 1 through 63 are incorporated by reference herein.

65.    By reason of the foregoing facts, a duty of good faith and fair dealing exists between Visa and First Data, which is the agent of certain Visa's members and which

has entered into a direct contractual relationship with Visa.

66.     First Data has breached this duty by refusing to comply with Visa's Rules concerning Private Arrangements and by proceeding and/or threatening to proceed with a Private Arrangement without Visa's prior approval and without agreeing to comply with the conditions imposed by Visa on such Private Arrangement.

67.     First Data's wrongful conduct has caused and continues to cause great and irreparable injury to Visa.  Visa has no adequate remedy at law for the injuries it is currently suffering and will continue to suffer.  Unless enjoined, First Data will further diminish the value of the VISA marks and erode the goodwill that Visa and its members have worked to foster in the VISA marks.  The amount of such injury is difficult to calculate but could amount to many millions of dollars over time.

## PRAYER FOR RELIEF

WHEREFORE, Visa prays for the following relief:

1.     A Declaration that First Data's actions and its threatened actions violate First Data's contractual obligations to Visa;

2.     On the Second, Third and Fourth Causes of Action, for an Order enjoining First Data from using any of the VISA marks in violation of Visa's Rules, or other terms of Visa's contracts with First Data [15 U.S.C. § 1116; 15 U.S.C. 1125(c)];

3.     On the Second through Seventh Causes of Action, for an Order enjoining First Data from commencing and/or proceeding with a Private Arrangement or a Private Arrangement "pilot" without obtaining Visa's prior approval and without complying with all other applicable provisions of Visa's Bylaws, Operating Regulations, or other rules and regulations, or other terms of Visa's contracts with First Data [15 U.S.C. § 1116; California Civil Code § 3423; California Code of Civil Procedure § 526];

4.     On the Second through Seventh Causes of Action, for damages in the amount proven at trial [15 U.S.C. § 1117; California Civil Code § 3300];

5.     On all Causes of Action, for its costs of suit, including attorneys' fees [15 U.S.C. § 1117]; and

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

6.  For such other and further relief as the Court may deem just and proper.

DATED:  April 24, 2002                    Respectfully submitted,

HELLER EHRMAN WHITE & McAULIFFE LLP


By _____

M. Laurence Popofsky
Stephen V. Bomse
Scott A. Westrich
Nina Anne M. Greeley

Attorneys for Plaintiff Visa U.S.A. Inc.

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

1

2

612207 v02.SF (D4DR02!.DOC)

3

4/24/02 2:48 PM (13057.0457)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES