1  BINGHAM McCUTCHEN, LLP
   GERALDINE M. ALEXIS (SBN 213341)
2  BETH H. PARKER (SBN 104773)
   DAVID P. CHIAPPETTA (SBN 172099)
3  JONATHAN HERSEY (SBN 189240)
   RAYMOND S. LARA (SBN 213181)
4  VICTORIA WONG (SBN 214289)
   Three Embarcadero Center, Suite 1800
5  San Francisco, California  94111-4067
   Telephone:  (415) 393-2000
6  Facsimile:  (415) 393-2286

7  Attorneys for Defendants and Counterclaimants
   First Data Corporation, First Data Resources Inc. and
8  First Data Merchant Services Corporation

9

   UNITED STATES DISTRICT COURT
10
   NORTHERN DISTRICT OF CALIFORNIA
11
   SAN FRANCISCO DIVISION
12

| | |
|---|---|
| 13 VISA U.S.A. INC., a Delaware corporation, | Case No. C 02-1786-JSW |
| 14         Plaintiff, | **DEFENDANTS' FIRST AMENDED COUNTERCLAIMS FOR** |
|      v. | **1) MONOPOLIZATION;** |
| 15 FIRST DATA CORPORATION, a Delaware corporation, FIRST DATA RESOURCES INC., a | **2) ATTEMPT TO MONOPOLIZE (CREDIT);** |
| 16 Delaware corporation, and FIRST DATA MERCHANT SERVICES CORPORATION, a | **3) ATTEMPT TO MONOPOLIZE (DEBIT);** |
| 17 Florida corporation, | **4) TYING (CREDIT)** |
| | **5) TYING (DEBIT)** |
| 18         Defendants. | **6) CONCERTED REFUSAL TO DEAL;** |
| 19 | **7) CARTWRIGHT ACT;** |
| 20 FIRST DATA CORPORATION, a Delaware corporation, FIRST DATA RESOURCES INC., a | **8) UNFAIR COMPETITION;** |
| Delaware corporation, and FIRST DATA | **9) DEFAMATION;** |
| 21 MERCHANT SERVICES CORPORATION, a Florida corporation, | **10) TRADE LIBEL;** |
| 22 | **11) INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** |
|         Counterclaimants, | **12) BREACH OF CONTRACT** |
| 23      v. | |
| 24 VISA U.S.A. INC., a Delaware corporation, | |
| 25         Counter-defendant. | |

26

1                                     **NATURE OF THE CASE**

2          1.       This is a counterclaim for injunctive relief and damages arising out of Counter-

3 defendant Visa U.S.A.'s anticompetitive conduct in several U.S. markets involving credit cards

4 and debit cards.

5         2.       Visa U.S.A. Inc. ("Visa") has dominated the major credit card, general purpose

6 credit card and debit card industries and has repeatedly abused its market power to stifle

7 competition, maintain its monopoly power and extend its monopoly power into other markets,

8 including the alleged markets for credit card and debit card network processing services.[1] It has

9 illegally maintained and extended its monopoly position in network processing services by

10 requiring its customers to pay for Visa's network processing services regardless of whether the

11 customers use those services; using its fee structure to raise the costs of using the services of

12 rivals and potential rivals, like First Data[2]; imposing unreasonable conditions on rivals' ability to

13 process Visa transactions; and, through pretext, threats and false claims, deterring and

14 intimidating its members from using more efficient providers of network processing services

15 such as First Data.  Visa's exclusionary and anticompetitive practices are designed to injure

16 competition in general, and Counterclaimants specifically.  In addition, Visa, acting through its

17 members, has engaged in and continues to engage in a concerted refusal to deal.  Competing

18 banks that comprise Visa have agreed not to enter into "Private Arrangements" with First Data to

19 purchase network processing services.  Visa has also engaged in illegal tying, trade libel, unfair

20 competition, defamation and interference with prospective economic advantage.  Furthermore,

21 _____

22   [1] The term "network processing services" has the same meaning as the term "network services,"
23 which was used in the counterclaimants' original Counterclaims, filed November 6, 2002.  The
term "systems" has the same meaning as the term "network systems," which was used in the
24 November 6, 2002 Counterclaims.  The nomenclature has been changed simply for clarity.

25   [2] For ease of reference only, counterclaimants First Data Corporation, First Data Merchant
Services Corporation, and First Data Resources, Inc. are referred to collectively as "First Data."

26

SF/21574725.1

1   Visa has breached its contractual obligations to First Data.  Visa's conduct has reduced and will

2   continue to reduce competition, consumer service, and consumer choice and has increased and

3   will continue to increase prices in the markets for Visa credit card network processing services

4   (or alternatively major credit card or general purpose credit card network processing services),

5   and for debit card network processing services.

6       3.    Visa has in the past purported to permit competition for the sale of credit card and

7   debit card network processing services by allowing so-called "Private Arrangements" between

8   competing network processors and Visa issuing banks, and between competing network

9   processors and merchant acquiring banks.  A Private Arrangement is defined by Visa as "[a]n

10   agreement where Authorization Requests and Transactions involving two different Members are

11   not processed through VisaNet."  Thus, processors such as First Data can bypass VisaNet, Visa's

12   proprietary network processing services for credit and signature debit transactions, where they

13   have the appropriate relationships with banks.  First Data calls such bypassing of VisaNet "intra-

14   processing."  For over 27 years, First Data has been intra-processing Visa transactions with the

15   consent and acquiescence of Visa.

16       4.    Each time Visa has determined that intra-processing presents a competitive threat,

17   however, Visa has acted with dispatch to block it.

18       5.    Most recently, First Data has announced an enhancement to its ability to intra-

19   process Visa transactions through its network, which it initially referred to as First Data Net.[3]

20   For the past three years, First Data Merchant Services Corporation ("FDMS") and First Data

21   Resources ("FDR") have worked to enhance their processing capabilities to enable FDR's

22   computers in Omaha to interface with FDMS's computers in Greenwood Village, Colorado

23   _____

24   [3] First Data subsequently expanded the term "First Data Net" to refer to a suite of services,
25   including services unrelated to intra-processing.  This Counterclaim uses the term "First Data
Net" to refer only to intra-processing.

26

FIRST AMENDED COUNTERCLAIM

1    (hereinafter called "Denver") and Hagerstown, Maryland so that internal authorizations, clearing

2    and settlements could be performed on a greater number of Visa transactions that are processed

3    by both FDR and FDMS.

4          6.      Consistent with its history of stifling competition, Visa has sought to block First

5    Data Net.  First, it insisted that First Data provide performance-related assurances supposedly

6    necessary to maintain Visa's networks.  Then, after First Data met in good faith with Visa and

7    provided adequate assurances concerning First Data Net, Visa imposed a unilateral 90-day

8    moratorium on new Private Arrangements.  During this time, First Data continued to attempt to

9    meet with Visa to provide further assurances about First Data Net.  Visa rebuffed these

10   overtures.

11         7.      Visa finally destroyed any illusion of allowing Private Arrangements when it

12   issued a per se rule prohibiting all new Private Arrangements on August 28, 2002.  Visa's claims

13   that it permits competition were thus exposed as a sham.

14         8.      In addition, Visa has begun offering a service called Merchant Direct Exchange

15   ("MDEX") to merchants, through merchant-acquirers.  Visa requires merchant-acquirers to

16   purchase virtually all of their network services from Visa, and it sells these services to acquirers

17   at a significantly higher rate for those merchants who do not utilize Visa's new MDEX service.

18   Visa does not permit merchants who purchase processing-related services from third-party

19   merchant processors, such as First Data, to qualify for the lower MDEX pricing on network

20   services.  Through its Visa Acquirers Partnership Program ("VAPP"), directed at the 25 largest

21   acquiring institutions, Visa also offers significant financial benefits, including discounts on

22   unrelated services, to merchant-acquirers who agree to promote MDEX to their merchants.  Visa

23   thereby has established a pricing structure that punishes merchant-acquirers and merchants that

24   do not use MDEX, or that wish to purchase merchant-processing-related services from third-

25   party merchant processors.  This pricing structure prevents First Data Merchant Services and

26   other third-party merchant processors from effectively competing to sell merchant processing

FIRST AMENDED COUNTERCLAIM

1   and merchant-processing-related services, including network processing services.  It also

2   represents an effort to shut third-party merchant processors out of the processing cycle, so as to

3   preclude them from offering processing or payment options that would compete with those

4   offered by Visa.

5       9.      Recently, Visa announced new criteria for its VAPP program.  On information

6   and belief, one of the new requirements is that all merchant-acquirers participating in the

7   program must certify that they will process 100% of non-on-us Visa transactions through

8   VisaNet.  Unless a merchant-acquirer complies with this new requirement, along with the other

9   requirements of the VAPP program, it will not be able to obtain the significant financial benefits

10  offered thereunder.

11                              **JURISDICTION**

12      10.     This is a civil counterclaim arising under the antitrust laws of United States,

13  Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1 & 2.  This Court has subject matter

14  jurisdiction over the counterclaims pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C.

15  §§ 4, 15 & 26, as well as 28 U.S.C. § 1367(a).  This Court has personal jurisdiction over Counter

16  -defendant by virtue of its transacting and doing business in this judicial district and by virtue of

17  the fact that Visa filed the underlying action with this Court.

18      11.     This Court has supplemental jurisdiction over the state law counterclaims

19  pursuant to 28 U.S.C. § 1367(a) because all such counterclaims originate from the same nucleus

20  of operative facts as do the federal counterclaims and thus are so related to the federal

21  counterclaims that they form part of the same case or controversy.

22                                **VENUE**

23      12.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c) in that Counter-

24  defendant resides in this district and a substantial part of the events and omissions occurred in

25  this district.  Under 28 U.S.C. § 1391(c), a corporation "shall be deemed to reside in any judicial

26  district in which it is subject to personal jurisdiction at the time the action is commenced."  Visa

SF/21574725.1

1   is headquartered and does business in this district and is therefore subject to personal jurisdiction

2   and thus resides in this district.  Visa also filed the underlying action in this district.

3                                          **PARTIES**

4          13.    Counterclaimant First Data Corporation ("FDC") is, and at all times herein

5   mentioned was, a corporation organized and existing under the laws of the State of Delaware,

6   with its principal place of business in Greenwood Village, Colorado.  FDC is one of the world's

7   leading processors of credit and debit card transactions of the types described below.

8          14.    FDC wholly owns FDR.  Counterclaimant FDR is, and at all times herein

9   mentioned was, a corporation organized and existing under the laws of the State of Delaware,

10  with its principal place of business in Omaha, Nebraska.  FDR is a processor for banks (called

11  "issuers") that issue Visa credit and debit cards; FDR processes Visa transactions made by

12  holders of those cards.  FDR also does some processing for merchant-acquirers (described

13  below).

14         15.    FDC also wholly owns FDMS.  Counterclaimant FDMS is, and at all times herein

15  mentioned was, a corporation organized and existing under the laws of the State of Florida, with

16  its principal place of business in Greenwood Village, Colorado.  FDMS is a merchant-acquirer

17  and a merchant processor; it acquires and processes transactions made by Visa cardholders at a

18  point of sale, over the telephone or on the Internet.

19         16.    FDR is a leading provider of processing services to card issuers and has been in

20  this business for more than 27 years.  FDMS is one of the country's largest processors of

21  payment transactions for merchant-acquirers and is a part-owner of several major merchant-

22  acquirers.  As such, FDR, FDMS, and their mutual parent, FDC, have a huge economic incentive

23  to ensure that Visa payment transactions proceed efficiently, safely, and with a minimum of

24  fraud.

25

26

Case No. C 02-1786-JSW
**FIRST AMENDED COUNTERCLAIM**

SF/21574725.1

1    17.    Counter-defendant Visa U.S.A. is, and at all times herein mentioned was, a

2  corporation organized and existing under the laws of the State of Delaware, with its principal

3  place of business in San Francisco, California.

4                              **TRADE AND COMMERCE**

5    18.    The relevant markets are large, and affect commerce nationwide.  Over 14,000

6  financial institutions in the United States issue Visa credit cards.  Nearly 7 billion Visa credit

7  card transactions were made in the 12 months ending March 31, 2004.  In 2003, over 556 million

8  major credit cards were in circulation, and over 11 billion transactions were made on those cards.

9  In addition, in 2003, over 256 million debit cards were in circulation, and over 16 billion debit

10  transactions were made.  Of these, 8.8 billion were Visa debit transactions.

11    19.    The conduct of Visa has taken place and continues to take place in, and

12  substantially affects, interstate commerce.

13    20.    The conduct of Visa has directly, substantially and foreseeably restrained

14  interstate commerce.

15    21.    Visa processes Visa transactions and charges and collects fees on Visa

16  transactions, a substantial proportion of which are made in interstate commerce.

17            **VISA CREDIT CARD NETWORK PROCESSING SERVICES**

18    22.    "Visa credit card network processing services" are the services used for

19  authorizing, clearing and settling Visa credit card transactions.

20    23.    As Visa states in its own Complaint, Visa credit card transactions benefit from

21  "efficient and sophisticated processing systems, innovative product platforms and other support

22  services."  First Amended Compl. at ¶ 3.  Thus, Visa credit card network processing services are

23  uniquely configured to handle transactions made on a Visa credit card.  Once a bank member

24  issues a Visa credit card, it is obligated to process transactions made on that card through Visa's

25  networks or another processor approved by Visa such as First Data.  Visa also acknowledges that

26  Visa bank members highly value the Visa mark for "its strong brand image and reputation

7

1    among consumers." *Id.*  Therefore, the ability to issue a Visa credit card is desired by issuers,

2    despite the fact that, as discussed below, Visa restricts issuers' ability to process their

3    transactions through networks other than VisaNet and requires the banks to pay for the

4    maintenance and services of VisaNet even if they do not use it.

5          24.      In a Visa credit card transaction, a merchant that wants to accept a Visa credit

6    card from a customer as payment follows a two-step transaction.  The first step is commonly

7    referred to as "authorization."  In this step, the merchant swipes the card through a terminal to

8    determine whether the cardholder is authorized to make that transaction and whether a credit line

9    or funds are available.  When the card is swiped, the transaction is sent to a processor, which

10   sends it to Visa, which then sends it to the issuer or the issuer's processor, to obtain

11   authorization.  If authorization is given, the process then is repeated in reverse.

12         25.      The second step, commonly called "settlement," occurs after the merchant obtains

13   authorization.  The merchant allows the cardholder to make the purchase.  Then the merchant

14   presents the Visa card transaction to a merchant-acquirer for settlement, usually within one or

15   two days.  Although the merchant-acquirer has contracted directly with the merchant to process

16   credit card transactions; merchant-acquirers often use third-party processors such as FDR and

17   FDMS to process these transactions.  The merchant-acquirer (or its processor) credits the

18   merchant's checking account with the amount paid by the cardholder (less a "merchant

19   discount") and then transmits the transaction data to VisaNet, which sends it to the issuer via the

20   issuer's processor.  The issuer then sends payment to the merchant-acquirer via VisaNet and the

21   merchant-acquirer's processor.  (If the merchant processor processes for both the merchant and

22   the issuer, using VisaNet may not be necessary (see *infra* at ¶ 33 ff).)

23         26.      Sometimes when a consumer makes a purchase using her Visa credit card, the

24   bank that issued the Visa card to the consumer also acts as a merchant-acquirer to acquire and

25   settle Visa transactions for the merchant who made the sale to the consumer.  In those cases, the

26   transaction is commonly called an "on-us transaction."  Visa defines an "on-us transaction" as

SF/21574725.1

1   "[a] transaction where the Issuer and Acquirer are the same Member."  On-us transactions can be

2   settled within the bank itself (or its processor) and need not go through VisaNet.

3        27.   There are many Visa transactions where FDC subsidiaries are processing on both

4   sides of the transaction; for example, it is often the case that FDMS processes a transaction for a

5   merchant-acquirer, and the transaction was made on a Visa credit card issued by a bank for

6   which FDR provides processing services.  Approximately 17% of all Visa transactions could be

7   intra-processed by FDC.

8        28.   These intra-processed transactions provide many benefits, including streamlining

9   transaction flows and dispute processing, improving posting and funding timeframes, eliminating

10   redundant processes and endpoints, reducing clearing and authorization fees and increasing the

11   efficiency of handling charge-backs in arbitration.

12   **MAJOR CREDIT CARD NETWORK PROCESSING SERVICES**

13        29.   "Major credit card network processing services" are the services used for

14   authorizing, clearing and settling transactions made on credit cards that carry relatively low

15   merchant discount fees, offer revolving credit, and have high market penetration, as measured by

16   transaction volume, among cardholders and merchants.  The major credit cards are Visa and

17   MasterCard.  The majority of bank credit card transactions are processed by Visa.

18   **GENERAL PURPOSE CREDIT CARD NETWORK PROCESSING SERVICES**

19        30.   "General purpose credit card network processing services" are the services used

20   for authorizing, clearing, and settling general purpose credit and charge card transactions.  The

21   primary general purpose credit and charge cards are Visa, MasterCard, American Express and

22   Discover.

23   **DEBIT CARD NETWORK PROCESSING SERVICES**

24        31.   "Debit card network processing services" are the services used for authorizing,

25   clearing, and settling debit card transactions made at the point-of-sale.

26

FIRST AMENDED COUNTERCLAIM

SF/21574725.1

1        32.     Debit cards are cards issued by banks that serve as both payment cards and ATM

2  cards.  When a cardholder uses her debit card to make a purchase at a merchant location, the

3  amount of the purchase is deducted from the cardholder's bank account.  Thus, the cardholder

4  pays directly from her account, rather than paying the issuing bank, as is done in a credit card

5  transaction.

6        33.     There are two types of debit cards, which compete with each other:  signature

7  debit cards and personal-identification-number (PIN) debit cards.  Signature debit cards bear

8  either a Visa or MasterCard logo.  Signature debit card transactions require the cardholder's

9  signature for verification and are processed over the same networks as credit card transactions.

10  PIN debit card transactions require the cardholder to enter a PIN for verification and are

11  processed over electronic funds transfer (EFT) networks.

12       **HISTORY OF BUSINESS DEALINGS BETWEEN FIRST DATA AND VISA**

13         **First Data's Historic Intra-Processing**

14        34.     In the 1970s, as part of its processing services, FDR began settling Visa

15  transactions internally for its bank customers where FDR also processed for the merchant-

16  acquirers on the other side of the transactions.  This internal settlement, called "intra-

17  processing," bypasses the use of VisaNet.  Visa, however, requires FDR to give it notice every

18  day of each and every transaction FDR settles internally by sending Visa a data file called a

19  "collections only" file.

20        35.     Since 1994, Visa has acknowledged that it wants to exclude processors as

21  competitors.  Since that time, Visa has expressed its anticompetitive belief that First Data and

22  other competing processors must ensure that Visa's revenues are not adversely affected by

23  competition from other suppliers of network processing services for Visa credit cards.

24        36.     In 1994 and 1995, FDC announced the acquisitions of Card Establishment

25  Services ("CES") and NaBANCO, two major providers of processing services to merchant-

26  acquirers.  CES and NaBANCO were later merged to form FDMS, which eventually assumed

SF/21574725.1

1   most of FDR's merchant processing business.  Visa immediately saw the new company as a

2   threat to its Visa credit card and debit card network processing services business and other

3   businesses.

4       37.     Feeling threatened by the growth of First Data and others in merchant-acquiring

5   and processing, Visa attempted to eliminate the nascent competition in providing Visa credit card

6   and debit card network processing services.  Visa declared in December 1994 a moratorium that,

7   as of January 15, 1995, prohibited all **new** Private Arrangements unless Visa approved them or

8   they involved fewer than 100,000 transactions per month.

9       38.     At a meeting in January 1995 with First Data executives to discuss Visa's

10  recently-announced rules on bypass, Visa acknowledged that it feared First Data as a nascent

11  competitor.  Then-Visa International Chairman Edward Jensen raised the concern that with the

12  acquisitions of CES and NaBanco, First Data would be taking traffic from the Visa network and

13  that First Data was being positioned as a third network (in addition to Visa and MasterCard).

14  Mr. Jensen made it clear that he did not want First Data to be a competitor.  After the meeting,

15  Visa continued to reiterate its desire to exclude First Data as a future competitor, both in

16  correspondence to First Data and at a subsequent task force meeting on the subject.  During that

17  time, because First Data's various processing platforms did not interface, it was not even able to

18  provide significant competing services; it was merely a nascent competitor to Visa.

19      39.     For the past 27 years, FDR has been providing, as an authorizing processor and as

20  a settling processor, intra-processing services.  Therefore, as of January 15, 1995, FDR already

21  had a Private Arrangement, in practice and by course of dealing, whereby it settled Visa

22  transactions without transmitting them to VisaNet.  For example, in 1995, First Data intra-

23  processed approximately 132 million Visa transactions.  Because it applied only to new

24  arrangements, Visa, in its announcement in December 1994, "grandfathered-in" that pre-existing

25  arrangement and did not subject it to Visa's approval requirement.  Moreover, Visa has been

26  aware of First Data's Private Arrangement since its inception and has never objected to it.  After

FIRST AMENDED COUNTERCLAIM

1  this announcement, First Data continued to intra-process Visa transactions, internally processing

2  over 147 million transactions in 1996 and over 97 million transactions in 1997.  In fact, as Visa

3  well knows, any time First Data adds a new portfolio or client to its intra-processing, it creates

4  new Private Arrangements.  Until recently, Visa never required a separate approval for the

5  Private Arrangements that resulted from these new portfolios and clients.

6      40.    In a letter to First Data of February 13, 2002, Visa again acknowledged that its

7  true concerns regarding First Data Net relate to its fear of First Data as a potential competitor.  In

8  that letter, Visa stated that First Data Net "potentially affects a significant number of Visa

9  members that have based their portfolio economics on the current interchange and processing

10  arrangement and may undermine existing and potential Visa product and/or acceptance

11  programs."

12      41.    Further, the letter required that:  "FDC must replicate all interchange structures

13  supported by Visa in the timeframes established by Visa, or suspend the Private Arrangement

14  until such time as the interchange structure can be supported.  Further, Members must

15  acknowledge, (i) the potential for two interchange rate structures, (ii) potential changes to the

16  Visa transaction pricing structure as Visa Systems will continue to provide Members with stand-

17  in authorization and clearing capacity without supporting transaction revenue, and (iii) the

18  potential for arrangement through a separate settlement process with the Member given that Visa

19  will not have access to each settlement transaction."

20      42.    First Data and Visa work closely to coordinate the technical arrangements

21  necessary to accommodate ongoing fluctuations in volume and client participation in First Data's

22  processing system.  This history of extensive and successful coordination between First Data and

23  Visa demonstrates Visa's longstanding awareness of the nature and extent of First Data's

24  processing and belies Visa's arguments that technical barriers justify banning Private

25  Arrangements.

26

FIRST AMENDED COUNTERCLAIM

1       43.     Over the past 27 years, pursuant to this arrangement, FDR has internally settled

2   Visa transactions for many issuers.  Currently, FDR internally settles approximately 150,000 to

3   160,000 such transactions per day, without sending them through VisaNet.

4       44.     Until recently, the FDC processors, FDR and FDMS, for technological reasons,

5   could only settle Visa transactions between issuers and merchant-acquirers that were both

6   processed on FDR's computers in Omaha, Nebraska.  Internal authorizations and settlements

7   could not be provided for Visa transactions where the merchant processing was performed on

8   FDMS's computers Denver and Hagerstown, Maryland.

9       **First Data Net**

10      45.     Visa complains that "[t]his case involves an effort by First Data to bypass Visa's

11  systems in authorizing, clearing and settling Visa transactions."  That is true.  Far from being

12  improper, however, First Data's actions constitute the very essence of pro-competitive behavior.

13      46.     For the past three years, FDMS and FDR have worked to enhance their processing

14  capabilities to enable FDR's computers in Omaha to interface with FDMS's computers in

15  Denver and Hagerstown so that internal authorizations and settlements can be performed on a

16  greater number of Visa transactions that are processed by both FDR and FDMS.  These enhanced

17  intra-processing capabilities were initially referred to as "First Data Net."

18      47.     When First Data announced plans to launch First Data Net in June 2001, Visa's

19  management announced to the press that "there's nothing at Visa to preclude [First Data] from

20  doing that."

21      48.     By 2001, FDR and FDMS had made the necessary investments and technological

22  changes in First Data Net.  FDR is now capable of offering its Visa-issuing bank customers (for

23  whom FDR provides processing services) the option of having the transactions that FDMS also

24  processes for merchant-acquirers cleared, authorized and settled entirely within the First Data

25  system, thus avoiding the need to transmit those transactions to VisaNet.  In other words, FDR

26  has expanded its intra-processing capabilities to include transactions processed on FDMS's

1   platform in Denver and Hagerstown.  The cost to First Data of expanding its intra-processing

2   capabilities to date is many millions of dollars.

3        49.      First Data Net will benefit FDR's issuing bank customers and FDMS's merchant-

4   acquiring customers by creating a single connection – from the point of sale  through settlement

5   – thus eliminating the inefficiencies of processing these transactions through VisaNet. First Data

6   Net provides direct routing, funding and settlement of payment transactions.  This simplified

7   process is expected to accelerate credits to merchants' accounts and reduce the costs of

8   processing to merchant-acquirers, while streamlining the process for resolving disputes between

9   merchants and cardholders regarding charges made on their Visa cards.

10       50.      To ensure that Visa transactions will be authorized and settled correctly and

11  seamlessly on FDR's expanded settlement platform, FDR selected a few of its issuing bank

12  customers and a single merchant-acquiring customer of FDMS to participate in the initial stage

13  of launching First Data Net.  During the initial stage, First Data Net would clear and settle Visa

14  transactions across three FDC platforms — Omaha, Denver and Hagerstown — and involve only

15  a tiny fraction of a percent of the total Visa transactions FDR routinely settles internally each day

16  pursuant to its "grandfathered-in" arrangement, without transmitting them through VisaNet.

17       51.      The initial stage of First Data Net is a procedure FDR often follows when it adds

18  features to its systems.  It was intended to ensure that the Visa issuers to whom FDR already

19  provides internal settlements on its Omaha platform can now receive authorization and

20  settlement services for Visa transactions acquired and processed on FDMS's Denver and

21  Hagerstown platform as seamlessly and accurately as the transactions FDR has internally

22  processed on its Omaha computers for over 27 years.

23       52.      First Data was not required by Visa's rules and regulations to seek or receive

24  Visa's approval for First Data Net because Visa "grandfathered-in" FDR's intra-processing in

25  January 1995.  Nevertheless, to give Visa an advance explanation of its change of volume – and

26  strictly as a courtesy – FDR notified Visa on January 11, 2002 of its intention to launch First

FIRST AMENDED COUNTERCLAIM

SF/21574725.1

1   Data Net.  (Over the years, FDR has followed the practice of giving Visa notice of any

2   significant changes in volumes in the transactions that FDR internally processes.

3          **Visa's Ban of Private Arrangements**

4          53.     Visa objected to First Data Net and in particular to the initial stage, claiming that

5   FDR did not notify Visa 120 days before the initial stage was to commence in April 2002 and did

6   not receive Visa's approval for First Data Net.  Visa claimed that such notification and approval

7   was required by its December 1994 rule change and its subsequent amendments.  Visa invoked

8   its notice and approval rule and then withheld approval by attaching unreasonable conditions for

9   the purpose of excluding FDR from, and to maintain its monopoly in or to attempt to

10  monopolize, the Visa credit card network processing services market (or alternatively, the major

11  credit card or general purpose credit card network processing services market) and the debit card

12  network processing services market.  But FDR is not required to give Visa notice of its

13  enhancement.  First Data Net is already covered by a pre-existing arrangement approved by Visa.

14         54.     Moreover, on April 9, 2002, Visa purported to waive its 120-day requirement by

15  granting conditional approval for First Data Net to proceed although the 120-day period had not

16  yet expired.  But in giving conditional approval, Visa attempted to impose unreasonable

17  obstacles with the intent of impeding and undermining First Data Net.  Visa's reliance on its

18  need to protect the integrity of its systems was merely a pretext to hide its anticompetitive and

19  exclusionary intent because Visa knew that First Data had been internally processing Visa

20  transactions for 27 years without harming the integrity of Visa's system.  Visa also demanded

21  that First Data guarantee transactions in the event of the insolvency of a Visa member, even

22  though Visa collects processing guarantee fees on every Visa transaction – even for the

23  transactions that First Data (and not Visa) processes.  Therefore, Visa sought to force First Data

24  to cover a risk for which Visa is already collecting a fee.  The bad faith nature of Visa's demands

25  is further shown by its repeated demands for irrelevant information and its practice of changing

26  its questions (thereby creating a moving target) as negotiations proceeded.  Although Visa

FIRST AMENDED COUNTERCLAIM

SF/21574725.1

1   claimed it needed 120 days to approve First Data Net, the 120 days have passed, and Visa did not

2   make a determination about First Data Net.  The moratorium was an attempt to relieve Visa of

3   the obligation to make the decision within 120 days, which itself confirms Visa's bad faith.

4        55.      Visa also imposed onerous and unnecessary real time reporting requirements of

5   authorizations.  Such requirements create a costly burden for First Data to provide information

6   that is not necessary to ensure that transactions are properly processed.  Furthermore, the

7   requirement adds costs to issuers who must take steps to supply transaction information they

8   would not be required to supply had they processed transactions through VisaNet.  The

9   requirement also provides Visa free information to support Visa's separately marketed CRIS

10  antifraud product, which competes directly with First Data's Falcon antifraud product.  Thus,

11  Visa has marshaled its monopoly power in network processing services for Visa credit cards to

12  a) reduce First Data's profitability; b) impose additional costs on issuers who use First Data to

13  process transactions; and c) to promote CRIS against Falcon with information it receives at no

14  charge from First Data.  On information and belief, First Data's real-time authorization data is

15  not required in order for Visa to provide any unique fraud detection service that could not be

16  provided at the individual issuer or merchant-acquirer level.

17       56.      Instead of granting approval within the 120-day period, on or about June 1, 2002,

18  Visa imposed a 90-day moratorium on all new Private Arrangements in a bid to further delay

19  First Data Net.  Then, on August 28, 2002, Visa destroyed any illusion that it would permit

20  competition when it announced a per se rule prohibiting all Private Arrangements, with the

21  exception of the limited number of transactions First Data was processing prior to its attempt to

22  test and launch First Data Net.  This ban was to take effect on October 1, 2002, and prevented the

23  implementation of First Data Net.

24       57.      According to Visa, this "decision means that First Data will not be allowed to

25  proceed with its Private Arrangement Application."  While Visa claimed that this decision does

26  not affect First Data's existing "intra-processing" volume, the practical effect of the decision is

FIRST AMENDED COUNTERCLAIM

1    to deny First Data flexibility to continue "intra-processing" transactions for its existing products.

2    Visa issued this ban to prevent First Data and all other potential competitors from gaining a

3    foothold in the market for Visa credit card network processing services (or alternatively in the

4    market for major credit card or general purpose card network processing services), and in the

5    market for debit card network processing services.  In conjunction with the announcement of the

6    ban, Visa informed First Data that it had conducted a study of Private Arrangements and had

7    prepared an "analysis" of its reasons for banning them.  Visa offered First Data a copy of this

8    analysis, but only under onerous confidentiality conditions.  Visa did not offer First Data access

9    to the underlying documents and analysis.

10          58.     First Data Net has not in any way endangered VisaNet or the services Visa

11   provides.

12          59.     The few transactions per day that FDR was able to process in the initial stage of

13   First Data Net are much fewer than the number of transactions FDR internally settled per day in

14   December 1994 and a tiny fraction of a percent of the Visa transactions FDR now internally

15   settles per day under the arrangement it has had in place for 27 years.  These transactions are

16   being processed safely and efficiently.

17          60.     Over the years, First Data has constantly added new clients to its processing

18   activities, including intra-processing.  Due to the size of First Data's processing business the

19   number of such changes is vast.  Adding new clients requires a great deal of coordination

20   between Visa and First Data.  For example, Visa must activate new codes for the clients and

21   must redirect their charge traffic.  First Data and Visa have thus for years overcome the technical

22   difficulties of adding new clients.  The amount, depth, and duration of this successful

23   coordination between First Data and Visa show that Visa's technical justifications for banning

24   "Private Arrangements" were and are pretextual.

25

26

Case No. C 02-1786-JSW
FIRST AMENDED COUNTERCLAIM

SF/21574725.1

1        **Other Wrongful Acts by Visa**

2        61.    In addition to banning intra-processing, Visa has initiated other acts designed to

3   harm First Data and thwart its efforts to compete against Visa.

4        62.    In October 2001, Visa informed First Data that FDR and FDMS were no longer

5   eligible for membership in Visa's "Re-engineering Disputes" ("RED") Working Group, which,

6   on information and belief, is in the process of substantially revising Visa's procedures for

7   resolving disputes over card charges.

8        63.    As a RED Group member since 1998, First Data had the right to review and

9   comment on proposed changes, to vote on proposals and to participate in the pilot program for

10  the new procedures.  On information and belief, the proposed changes the RED Group is

11  developing are the largest changes in dispute processing the industry has ever experienced.

12       64.    Visa informed FDR and FDMS that they were being excluded from the RED

13  Group to cut costs associated with Group members' travel, lodging, and gifts from Visa.  First

14  Data proposed alternative methods of cutting costs, such as members financing their own

15  expenses, and FDMS providing funding for teleconferencing into the meetings.  However, Visa

16  failed to explore any of these options.

17       65.    Despite excluding FDR and FDMS from the RED Group ostensibly to cut costs,

18  Visa subsequently added a new member to the group, Fifth Third Bank.

19       66.    On information and belief, Visa, through letters, electronic mail messages and

20  oral representations, made statements to First Data's customers and other Visa Members who are

21  prospective customers disparaging First Data's Visa credit card and debit card network

22  processing services and its ability to provide high-quality network processing services for Visa

23  credit and debit transactions.  These statements falsely implied that First Data Net is inadequate

24  and unsafe for use by Visa members.  For example, on April 16, 2002, Visa sent a memorandum

25  to all Visa U.S.A. Members stating that Visa sued First Data because "the issues presented by a

26  Private Arrangement go to the heart of the branded Visa payment service itself on which

SF/21574725.1

1   members, consumers, and merchants rely — its quality, integrity, predictability and reliability."

2   Visa also contacted banks that were considering participating or had agreed to participate in the

3   initial stage of First Data Net, and attempted to convince these banks to withhold or withdraw

4   their participation.  Prior to these acts, Visa implied that it might take such action in a letter to

5   First Data dated March 4, 2002.  In that letter, Visa stated that First Data's plans were "quite

6   unacceptable to us and, we suspect, our Members including those whose transactions would be

7   directly affected."  Steve Ruwe, Letter to Lori E. Kastrick, Vice President, Settlement/Industry

8   Compliance, First Data Resources, March 4, 2002.  Visa's statements resulted in withdrawal of

9   one initial stage participant from First Data Net.

10          67.     On May 30, 2002, Visa announced another moratorium on all new Private

11  Arrangements thereby preventing any further competition to sell Visa credit card and debit card

12  network processing services.

13          68.     In June 2002, Visa informed First Data that Visa had changed its "philosophy" as

14  to the back-up documentation required for its arbitration process to resolve disputes over

15  charges.  Visa stated that, effective immediately, the documentation First Data has used for the

16  past fifteen years to show when a credit has been given, in the form of a computer "screen shot"

17  of the credit, would no longer be adequate.  Instead Visa now requires First Data to provide a

18  "post-edit log."  However, post-edit logs are not readily available to First Data:  First Data must

19  purchase the post edit logs from Visa.  Thus, Visa would require First Data to purchase the log

20  from Visa and then turn around and send it right back to Visa.  On information and belief, that

21  purchase would cost approximately $25 for a single post-edit log.  On information and belief,

22  this "philosophy change" is not documented in the Visa regulations.

23          69.     On June 3, 2002, Visa also notified First Data that it would be excluded from

24  Visa's Member Call Program.  Participants in the program receive valuable monthly reports

25  related to retrieval/mediation, chargeback, arbitration and compliance activity.  As a result of this

26  "philosophy change," First Data will receive information only for its client Chase Merchant

FIRST AMENDED COUNTERCLAIM

1    Services through JP Morgan Chase, which continues to participate in the Program, and then only

2    to the extent JP Morgan Chase chooses to share that information.

3            **Visa's Merchant Direct Exchange Product**

4            70.     Visa also has begun offering large merchants, through acquirers, a new service

5    called Merchant Direct Exchange (MDEX).  MDEX allows a merchant to connect to VisaNet

6    directly, bypassing third-party merchant processors that provide a connection between merchants

7    and VisaNet.  In other words, MDEX gives Visa the ability to act as a merchant processor in

8    competition with FDMS, at the same time that Visa denies First Data the ability to compete to

9    sell network processing services.

10           71.     Under Visa's rule banning all new Private Arrangements, merchant-acquirers

11   must use VisaNet network processing services for virtually all Visa card transactions.  The cost

12   of VisaNet network processing services sets a floor on the price a merchant-acquirer must charge

13   a merchant to profitably process a transaction.  In the past, VisaNet network processing services

14   sold to merchant-acquirers were subject to tiered pricing based on volume.  However, prior to

15   introducing MDEX, Visa eliminated its tiered pricing structure.

16           72.     Instead, Visa now sells network processing services at a significantly higher rate

17   to those merchants who do not utilize Visa's new MDEX service.  Merchants who purchase

18   merchant-processing-related services from third-party merchant processors such as FDMS are

19   not eligible for MDEX pricing, and therefore are penalized for using a third-party merchant

20   processor.  Through the Visa Acquirer Partnership Program (VAPP), directed at the top 25

21   acquiring institutions, Visa also offers discounts on unrelated services to acquirers who agree to

22   promote MDEX.  The MDEX pricing structure prevents First Data Merchant Services and other

23   third-party merchant processors from effectively competing to sell merchant processing and

24   merchant-processing-related services, including network processing services.  It also represents

25   an effort to shut third-party merchant processors out of the processing cycle, so as to preclude

26

                              FIRST AMENDED COUNTERCLAIM                    Case No. C 02-1786-JSW

SF/21574725.1

1    them from offering processing or payment options that would compete with those offered by

2    Visa.

3                    **VISA ACQUIRER PARTNERSHIP PROGRAM (VAPP)**

4           73.     Through its VAPP program, Visa offers merchant-acquirers significant financial

5    benefits, such as lower assessments and authorization access fees.  In exchange, the acquirer

6    must inform and encourage the selection of MDEX solutions for all appropriate merchants.

7           74.     On information and belief, Visa recently announced new criteria for participation

8    in VAPP.  It now will require acquirers to also certify that they will process 100% of non-on-us

9    Visa transactions through Visa-Net.  In other words, acquirers are precluded from using third-

10   party merchant processors that conduct any intra-processing if they want to take advantage of the

11   significant financial discounts offered by participation in VAPP.  This is true even if the intra-

12   processing conducted by the merchant processor is performed with the full consent and approval

13   of Visa, such as that conducted wholly on First Data's Omaha platform.

14   **VISA'S PROCESSING GUARANTEE AND TRANSACTION PROCESSING FEES**

15          75.     Visa's mandatory processing guarantee fees, which apply regardless of whether a

16   transaction passes through VisaNet or a different network, its tiered transaction processing fee

17   structure, its MDEX pricing, and its VAPP program destroy any incentive for issuers and

18   merchant-acquirers to go outside VisaNet to find lower transaction fees.  Even if a bank finds a

19   company, such as First Data, that is willing to charge less for authorization and settlement

20   services, it could not economically benefit from using these alternative services, because it

21   would end up paying more to process each transaction.  Of course, as of August 28, 2002, when

22   Visa banned Private Arrangements, banks are not even permitted to obtain their network

23   processing services outside VisaNet (other than what they are permitted to do on First Data's

24   Omaha platform).

25          76.     Visa's General Rule 9.2.A requires all member banks to pay "processing

26   guarantee" fees for every transaction processed, regardless of whether the transaction was

1  actually processed through VisaNet.  This fee is required from member banks who use (and pay)

2  outside processors capable of providing intra-processing, such as First Data, and is designed to

3  prevent competition from those processors by adding to the costs of using outside processors.  In

4  a March 1996 announcement in VisaNet Processor Digest, Visa first announced the VisaNet

5  Processing Guarantee fee.  This fee was described as "a new charge to cover the cost of

6  providing the Visa settlement guarantee, and to recover the cost of providing the VisaNet

7  processing infrastructure."  Thus, on information and belief, the fee is supposed to be used at

8  least in part to guarantee that a merchant is paid if an issuer cannot meet its financial obligations.

9        77.      In December 1994, Visa announced a rule that requires all Visa member banks to

10  pay a transaction processing fee for every transaction, regardless of whether the transaction was

11  actually processed through VisaNet.  This fee operates as a tax on member banks who use

12  outside processors capable of providing intra-processing, such as First Data, and is designed to

13  prevent competition from those processors by adding to the costs of using them.  These fees are

14  in addition to the interchange fee charged to the acquirer if the transaction is processed by Visa.

15  The rule also created a "tiered" volume discount, such that, if a bank processes a certain number

16  of transactions through VisaNet, it is charged a lower interchange transaction fee on *all* of its

17  Visa network transactions.

18        78.      The effect and design of Visa's fees is to force usage of VisaNet and to prevent

19  competition with Visa.  These rules were created through the collective action of Visa's bank

20  members.

21        79.      Visa's rules and Visa's enforcement of those rules in an arbitrary and capricious

22  manner prevent other processors such as First Data, which have the ability to authorize and settle

23  transactions between issuers and merchant-acquirers without using VisaNet, from competing in

24  the markets for Visa credit card network processing services (or alternatively, major credit card

25  or general purpose credit card network processing services) and debit card network processing

26  services.  Because Visa issuers are required to pay certain Visa processing guarantee fees

1    regardless of whether they actually utilize Visa's system, and because they receive anti-

2    competitively designed volume discounts on transaction processing charges, they have no

3    incentive to go outside the system to negotiate lower fees, because that would require them to

4    pay more for the same transaction.  Thus, Visa's fees create strong economic disincentives to use

5    competitors' services.  Because the Visa mark is highly valuable to its members, customer banks

6    cannot afford to violate Visa rules by refusing to pay the fees and risk being stripped of their

7    membership.  In addition, because no third party has relationships with all Visa member banks,

8    those members must process many transactions through VisaNet.  Visa, therefore, has the power

9    to impose the mandatory processing guarantees and to further induce the exclusive use of

10   VisaNet by imposing a tiered fee system.  Thus, Visa's fees effectively bar new competitors

11   from entering or expanding their services in the market.

12                                   **ASSESSMENT FEES**

13            80.      In addition to the fees described above, Visa also requires merchant-acquirers to

14   pay "assessment fees" based on gross sales volume (which includes transactions that are

15   authorized or settled outside VisaNet).  In 2001, this fee constituted 0.084% of the gross sales

16   volume generated by the acquirers' merchants.  On information and belief, these fees are used to

17   cover Visa's brand marketing, operating activities and, most significantly, new product

18   development.  By requiring merchant-acquirers to pay to support Visa's new product

19   development, Visa is attempting to stifle competition:  merchant-acquirers are forced to

20   underwrite Visa's costs of developing new products that will compete with their own products as

21   they attempt to enter the Visa credit card network processing services market (or alternatively,

22   the major credit card or general purpose credit card network processing services market) and the

23   debit card network processing services market.

24                              **VISA'S HONOR ALL CARDS RULE**

25            81.      Visa's rules require merchants to honor all Visa cards: a merchant must not favor

26   any single issuer's Visa card over any other issuer's Visa card by accepting one issuer's card

SF/21574725.1

1   (and not others') to encourage the use of that particular issuer's card.  Because of the "honor all

2   cards" rule, issuers have little incentive to negotiate interchange fees with merchant-acquirers for

3   particular merchants.  Varying interchange fees would give merchants incentives to accept only

4   those cards that carried lower fees.

5       82.    On information and belief, Visa does not allow merchants to offer discounts or

6   other incentives at the point of sale that reward consumers for using a particular issuer's Visa

7   card.

8       83.    The "honor all cards" rule is anticompetitive and harms third-party providers of

9   network processing services, such as First Data.  In the absence of the "honor all cards" rule,

10  First Data would be able to compete to provide Visa credit card and debit card network

11  processing services, for example by working with merchants and issuers to offer such discounts

12  and incentives for the use of cards for which First Data provides intra-processing.  This would

13  provide savings to merchants by offering a lower interchange fee.  These savings would be

14  passed on to consumers in the form of lower retail prices.

15                          **FIRST CAUSE OF ACTION:**

16              **SHERMAN ACT, SECTION 2 -- MONOPOLIZATION**

17      84.    First Data incorporates each and every one of the preceding  allegations  as

18  though fully set forth here.

19      85.    First Data's monopolization claim relates to the Visa credit card network

20  processing services market, or alternatively, the major credit card network processing services

21  market.  The relevant geographic market is the United States.  First Data is a seller in the Visa

22  credit card network processing services (or alternatively, major credit card network processing

23  services) market.  Its customers include both issuers and merchant-acquirers.

24      86.    Visa credit card network processing services constitute a relevant market because

25  Visa credit card network processing services are unique and are not reasonably interchangeable

26  with any other credit card network processing services.  Once a bank issues a Visa credit card, it

24

Case No. C 02-1786-JSW

FIRST AMENDED COUNTERCLAIM

1    is locked into the purchase of Visa credit card network processing services.  In addition, bank

2    issuers are unable to determine what future costs and fee increases they will face before they

3    issue a Visa credit card.  Furthermore, it is impossible for an issuer of Visa credit cards to

4    process transactions for those cards with any network other than VisaNet.  With exception of the

5    purported ability to enter "Private Arrangements" (which in reality Visa actively worked to

6    prevent and which as of August 28, 2002 was eliminated), the transaction must be processed

7    over VisaNet.  There are huge barriers to entry into the Visa credit card network processing

8    services market.  The barriers to entry include, *inter alia*, Visa's use of its rule-making power to

9    make it uneconomical to enter this market or to ban entry altogether.

10        87.    Visa possesses monopoly power in the relevant market of Visa credit card

11   network processing services.  Visa authorizes and settles billions of transactions per year through

12   VisaNet.  Visa itself proclaims that it processes more than 99% of all U.S. Visa transactions.

13   Visa has over 14,000 U.S. financial institutions as members, and 21,000 members worldwide.

14        88.    In the alternative, major credit card network processing services constitute a

15   relevant market because these services are unique and not reasonably interchangeable with any

16   other credit card network processing services.  There are huge barriers to entry into this market.

17   These barriers include, *inter alia*, Visa's use of its rulemaking power to make it uneconomical to

18   enter this market.

19        89.    Visa possesses monopoly power in the relevant market of major credit card

20   networking processing services.  In 2003, Visa processed 57% of all transactions in this market.

21        90.    Visa's market power in the relevant market is demonstrated by the inability of

22   merchants to decline to accept Visa-branded bank cards; Visa's ability to price discriminate

23   among merchants; and the barriers to entry in the relevant market. Visa's market power is also

24   demonstrated by its ability to price discriminate among issuers.  It does this by charging tiered

25   transaction fees, allowing larger issuers to pay substantially lower fees for transaction

26   processing.  It also discriminates by granting certain of its issuers incentives (whether in the form

25

FIRST AMENDED COUNTERCLAIM

SF/21574725.1

1  of bonuses, rebates, market allowances or discounts) to issue credit cards under the Visa brand

2  and use its myriad products and services.  Almost all of the Visa members that have received

3  these special deals have representatives on the Visa Board.

4        91.     At the time most issuers entered into agreements to issue Visa cards, they did not

5  know and could not have known that they subsequently would be completely locked into the

6  purchase of Visa card network processing services through VisaNet.  Indeed they had reason to

7  believe they would have the ability to bypass VisaNet, given the opinion in *National Bancard*

8  *Corp. v. Visa U.S.A. Inc.*, 779 F.2d 592 (11th Cir. 1986) ("*NaBANCO*").  This decision was

9  based in good part on the purported ability of merchant-acquirers to avoid paying the interchange

10  fee unilaterally set by Visa by bypassing VisaNet and negotiating a lower fee directly with an

11  issuer on an individual basis.  Until August 28, 2002, the Visa rules purported to allow intra-

12  processing, but the rules were enforced in such a way as to make Private Arrangements

13  uneconomical.  On August 28, 2002, Visa announced that it was prohibiting all intra-processing

14  (other than what First Data processed on its Omaha platform as of April 15, 2002).  Visa has no

15  legitimate business justification for prohibiting intra-processing.

16        92.     Circumstances have changed dramatically since the *NaBANCO* holding.  Banks

17  no longer bypass VisaNet (as they supposedly did at the time of the *NaBANCO* case) to negotiate

18  separate interchange fees, a condition which was necessary to the Eleventh Circuit's *NaBANCO*

19  holding.  First, the Visa Board's 1994 changes to its fee structure prevented issuers from

20  bypassing VisaNet to avoid paying newly instituted "processing guarantee" fees.  Under the new

21  structure, Visa charges processing guarantee fees on all transactions, whether or not VisaNet is

22  used.  By requiring an issuer that authorizes or settles transactions outside VisaNet to pay Visa a

23  fee for the transaction anyway, Visa has destroyed the incentive for issuing banks to contract

24  with merchant-acquirers to settle transactions outside the network.

25        93.     Second, Visa has imposed a tiered "transaction processing" fee that charges banks

26  different rates depending on the number of transactions they process through VisaNet.  If the

FIRST AMENDED COUNTERCLAIM

1   number of transactions a bank processes through VisaNet exceeds one of ten threshold levels, the

2   bank will be charged a reduced fee for *all* of its transactions.  Under this fee structure, issuers

3   have no incentive to process fewer than all of their transactions within VisaNet.  Consequently,

4   they have no incentive to enter into bilateral agreements with acquirers to bypass the network.

5   While giving issuers the illusion of choice, Visa, in reality, gives individual issuers no choice --

6   bilateral bypass arrangements have become totally uneconomical.  Thus, the ability to bypass

7   VisaNet, which the *NaBANCO* court had deemed so important, no longer exists.  As a result,

8   banks who contracted to become Visa issuers and merchant-acquirers have less ability to control

9   the amount of fees they pay than when they originally entered into those agreements.  When they

10  entered into contracts with Visa, they could not have known about the later changes in fee

11  structures that, until August 2002, virtually eliminated the option to bypass VisaNet and, after

12  August 2002, totally eliminated that option.

13          94.     Visa has willfully maintained its monopoly power in the relevant market by

14  (1) demanding that First Data comply with unreasonable conditions before approving First Data

15  Net and subsequently banning the implementation of First Data Net and all other Private

16  Arrangements, with the intent of blocking First Data's competition in providing credit card

17  network processing services for Visa transactions; (2) imposing mandatory processing guarantee

18  fees on issuers regardless of whether the issuers utilize Visa's network; (3) creating tiered

19  volume discounts on transaction processing fees, which make it economically infeasible to deal

20  with Visa's competitors; (4) imposing assessment fees that fund the development of Visa's

21  competing products; (5) excluding First Data from the Re-engineering Disputes Working Group,

22  an important Visa policy-setting group; (6) creating unduly burdensome documentation

23  requirements for arbitration cases including First Data; (7) excluding First Data from Visa's

24  valuable Member Call Program; (8) threatening participants in First Data Net; (9) blocking

25  competition on interchange fees and merchant discounts through its "honor all cards" rule;

26  (10) selling network processing services at a higher price for non-MDEX customers, or those

SF/21574725.1

1   who purchase merchant processing-related services from third-party merchant processors; and

2   (11) requiring acquirers, as a condition to join VAPP and obtain its significant financial benefits,

3   to promote MDEX and certify that they process 100% of non-on-us Visa transactions through

4   VisaNet..  These actions have prevented and continue to prevent First Data from expanding its

5   offerings in the relevant market and from adequately carrying out its current services.  Visa has

6   no legitimate business justification for its actions.  Visa's actions have violated Section 2 of the

7   Sherman Act.

8        95.    The initial stage of First Data Net is a key step in the development of First Data's

9   expanded settlement services, which would compete with Visa by performing intra-processing

10   services for banks through its subsidiaries FDR and FDMS.  First Data would offer issuing banks

11   faster processing and funding to merchants and, in the future, greater fraud protection than is

12   currently available through Visa.

13        96.    Visa's conditions for approval of First Data Net prior to August 28, 2002 were

14   pretexts and intended to block First Data's competition in providing network processing services.

15   The pretextual nature of Visa's conditions are underscored by the fact that First Data has been

16   handling intra-processing for over 27 years and that Visa's approval is not even required because

17   First Data's intra-processing was grandfathered-in under Visa's December 1994 rule change.

18        97.    Visa's processing guarantee fees and tiered-volume discounts on transaction

19   processing fees force issuers to process their transactions only through VisaNet and thereby

20   make it economically infeasible for issuers to use any other Visa credit card network processing

21   services besides VisaNet.  Thus, these fees prevent First Data from effectively competing in the

22   relevant market.

23        98.    Visa's imposition of assessment fees forces merchant-acquirers like First Data to

24   fund the development of products that compete with their own products, preventing First Data

25   from effectively competing with Visa in the relevant market.

26

SF/21574725.1

99.     Visa's requirement that First Data provide real-time authorization data before Visa will approve its intra-processing imposes high, unnecessary costs on First Data, preventing First Data from offering competitively priced processing services.

100.     Visa's exclusion of First Data from its RED Working Group hinders First Data's ability to ensure that the new dispute resolution procedures properly serve its clients and thereby harms First Data's ability to compete in the relevant market.

101.     Visa's "philosophy" change in its documentation policies for arbitration of disputed charges hinders First Data's ability to represent its clients' interests in the arbitration process and to ensure that its clients are credited and debited properly in Visa transactions.  The changed documentation requirement harms First Data's ability to compete in the relevant market.

102.     Visa's exclusion of First Data from its valuable Member Call Program blocks First Data's access to important information regarding its own and its competitors' performance. First Data's exclusion harms its ability to compete in the relevant market.

103.     Visa's exercise of monopoly power has a direct and substantial effect on interstate commerce because transactions authorized and settled by First Data are transmitted electronically through interstate telecommunication systems among First Data, merchants, merchant processors and issuers from every state in the U.S.A.

104.     As a direct and proximate result of Visa's monopolization of the relevant market, consumers and competition in the relevant market have been injured, and First Data has been harmed in that (1) it is constrained from expanding its offerings and from adequately providing its current services in the relevant market; (2) its goodwill and reputation are thereby harmed; and (3) it is unable to recoup its investment costs of many millions of dollars in making its Omaha, Denver and Hagerstown computer platforms interface so as to allow internal processing of authorization and settlement transactions of Visa transactions that are processed by both FDR and FDMS.

SF/21574725.1

1    105.    The harm to First Data from these activities is ongoing and cumulative, and is not

2    susceptible to full relief via monetary compensation, leaving First Data no adequate remedy at

3    law.  The amount of such injury is difficult to calculate, but could amount to hundreds of

4    millions of dollars over time.

5                              **SECOND CAUSE OF ACTION:**

6        **SHERMAN ACT, SECTION 2 -- ATTEMPT TO MONOPOLIZE (CREDIT)**

7        106.    First Data incorporates paragraphs 1 through 80, 83 through 85, 87 through 90,

8    and 92 through 99 of the preceding allegations as though fully set forth here.

9        107.    Visa has attempted to monopolize the Visa credit card network processing

10   services market, or alternatively the major credit card network processing services market, or

11   alternatively the general purpose credit card network processing services market.

12       108.    The major credit card network processing services market includes network

13   processing services for major credit cards (*e.g.*, Visa and MasterCard).  The major credit card

14   network processing services market provides services that cannot reasonably be replaced by

15   other sources.  There are huge barriers to entry into this market.  These barriers to entry include,

16   *inter alia*, Visa's use of its rule-making power to make it uneconomical to enter the market.

17       109.    Visa possesses market power in the relevant market of major credit card network

18   processing services.  In 2003, Visa processed 57% of all transactions in this market.

19       110.    The general purpose credit card network processing services market includes

20   network processing services for major credit and charge cards (*e.g.*, Visa and MasterCard), as

21   well as other general purpose credit and charge cards (*e.g.*, American Express).  The general

22   purpose credit card network processing services market provides services that cannot reasonably

23   be replaced by other sources.  There are huge barriers to entry into the general purpose credit

24   card network processing services market.  The barriers to entry include, *inter alia*, Visa's use of

25   its rule-making power to make it uneconomical, if not impossible, to enter the market.

26

1        111.    Visa possesses market power in the general purpose credit card network

2    processing services market.  In 2003, Visa had a 42% share of the purchase volume in this

3    market.

4        112.    The geographic market is the United States.  First Data is a seller in the relevant

5    market.  Its customers include both issuers and merchant-acquirers.

6        113.    Visa has taken the actions described above wrongfully and willfully and with the

7    specific intent of attempting to gain a monopoly in the relevant market.  Visa has no legitimate

8    business justification for its actions.  Visa's action violates Section 2 of the Sherman Act.

9        114.    Visa has demonstrated a dangerous probability of success in its efforts to gain a

10   monopoly in the relevant market.  Visa continues to dominate that market, to the detriment of

11   consumers and competition.

12       115.    As a direct and proximate result of Visa's attempt to monopolize, consumers and

13   competition in the relevant market have been injured, and First Data has lost profits and has been

14   harmed in that (1) it is constrained from expanding its offerings and from adequately providing

15   its current services in the relevant market; (2) its goodwill and reputation are thereby harmed;

16   and (3) it is unable to recoup its investment costs of many million of dollars in making its

17   Omaha, Denver and Hagerstown computer platforms interface so as to allow internal processing

18   of authorization and settlement transactions of Visa transactions that are processed by both FDR

19   and FDMS.

20       116.    The harm and lost profits to First Data from these activities is ongoing and

21   cumulative, and is not susceptible to full relief via monetary compensation, leaving First Data no

22   adequate remedy at  law.  The amount of such injury is difficult to calculate, but could amount to

23   hundreds of millions of dollars over time.

24

25

26

SF/21574725.1

1   **THIRD CAUSE OF ACTION:**

2   **SHERMAN ACT, SECTION 2 -- ATTEMPT TO MONOPOLIZE (DEBIT)**

3        117.    First Data incorporates paragraphs 1 through 80, 87 through 90, and 92 through

4   99 of the preceding allegations as though fully set forth here.

5        118.    Visa has attempted to monopolize the debit card processing services market.

6        119.    The debit card network processing services market is a relevant market because

7   its services are unique and are not reasonably interchangeable with any other network processing

8   services.  There are large barriers to entry into this market.  These barriers include, *inter alia*,

9   Visa's use of its rule-making power to make it uneconomical, if not impossible, to enter the

10  market.

11       120.    Visa has market power in the debit card network processing services market.

12  Visa has an approximate 60% share of the transaction volume in the point-of-sale debit card

13  network processing services market.

14       121.    The geographic market is the United States.  First Data is a seller in the debit card

15  network processing services market.  Its customers include both issuers and merchant-acquirers.

16       122.    Visa has taken the actions described above wrongfully and willfully and with the

17  specific intent of attempting to gain a monopoly in the debit card network processing services

18  market.  Visa has no legitimate business justification for its actions.  Visa's action violates

19  Section 2 of the Sherman Act.

20       123.    Visa has demonstrated a dangerous probability of success in its efforts to gain a

21  monopoly in the market for debit card network processing services.  Visa continues to dominate

22  that market, to the detriment of consumers and competition.

23       124.    As a direct and proximate result of Visa's attempt to monopolize, consumers and

24  competition in the relevant market have been injured, and First Data has lost profits and has been

25  harmed in that (1) it is constrained from expanding its offerings and from adequately providing

26  its current services in the debit card network processing services market; (2) its goodwill and

FIRST AMENDED COUNTERCLAIM

1   reputation are thereby harmed; and (3) it is unable to recoup its investment costs of many million

2   of dollars in making its Omaha, Denver and Hagerstown computer platforms interface so as to

3   allow internal processing of authorization and settlement transactions of Visa transactions that

4   are processed by both FDR and FDMS.

5        125.   The harm and lost profits to First Data from these activities is ongoing and

6   cumulative, and is not susceptible to full relief via monetary compensation, leaving First Data no

7   adequate remedy at  law.  The amount of such injury is difficult to calculate, but could amount to

8   hundreds of millions of dollars over time.

9                          **FOURTH CAUSE OF ACTION:**

10                  **SHERMAN ACT, SECTION 1 -- TYING (CREDIT)**

11        126.   First Data incorporates paragraphs 1 through 80 of the preceding allegations as

12   though fully set forth here.

13        127.   Visa's credit card system, which includes the Visa brand, as well as rules and

14   protocols for conducting Visa credit card transactions (*i.e.*, providing merchant acceptance of the

15   Visa brand, and directly or indirectly establishing a merchant discount rate) ("the Visa card

16   system"), constitutes a relevant tying market because it is unique and not reasonably

17   interchangeable with any other card system.  In other words, the Visa card system is the rules

18   and regulations among the various Visa members that create a national credit payment system

19   using the Visa brand.

20        128.   Once a bank issues a Visa credit card, it is locked into the use of its credit card

21   system.  In addition, Visa issuers are unable to determine what future costs and fee increases they

22   will face before they issue a Visa credit card.  Under Visa's rules, it is impossible for an issuer to

23   "switch" from using a Visa credit card system to any other type of card system for the Visa credit

24   cards it has issued.

25        129.   Visa has market power in the Visa credit card system market.  On information and

26   belief, Visa processes approximately 99% of all Visa credit card transactions.

1        130.    In the alternative, the card systems that include brands, as well as rules and

2   protocols for conducting major credit card transactions (*i.e.*, providing merchant acceptance of

3   major credit card brands, and directly or indirectly establishing merchant discount rates) ("major

4   credit card network systems"), constitute a relevant tying product market.  The primary major

5   credit cards are Visa and MasterCard.  Major credit card systems are unique and not reasonably

6   interchangeable with other types of card systems.

7        131.    Visa has market power in the major credit card systems market.  Visa members

8   account for approximately 57% of the transactions in this market.

9        132.    In the alternative, the card systems that include brands, as well as rules and

10   protocols for conducting general purpose credit and charge card transactions, providing merchant

11   acceptance of credit and charge card brands, and directly or indirectly establishing merchant

12   discount rates ("general purpose credit card systems"), constitute a relevant tying product

13   market.  General purpose credit and charge cards are credit cards issued by either a bank or other

14   issuer and may or may not offer revolving credit.  The primary general purpose credit and charge

15   cards are Visa, MasterCard, American Express and Discover.  General purpose credit card

16   systems are unique and not reasonably interchangeable with other types of card systems.

17        133.    Visa has market power in the general purpose credit card systems market.  Visa

18   members account for approximately 42% of the dollar volume of credit and charge card

19   transactions in this market.

20        134.    Visa credit card network processing services constitute the relevant tied market.

21        135.    Visa's market power in the relevant tying product market is demonstrated by the

22   inability of merchants to decline to accept Visa-branded bank cards; Visa's ability to price

23   discriminate among merchants; and the barriers to entry in the relevant market.  Visa also has the

24   ability to price discriminate among issuers.  It does this by charging tiered transaction fees,

25   allowing larger issuers to pay substantially lower fees for transaction processing.  It also

26   discriminates by granting certain of its issuers incentives (whether in the form of bonuses,

Case No. C 02-1786-JSW
FIRST AMENDED COUNTERCLAIM

1    rebates, market allowances or discounts) to issue credit cards under the Visa brand and use its

2    myriad products and services.  Almost all of the Visa members that have received these special

3    deals have representatives on the Visa Board.

4         136.    Visa has engaged in and continues to engage in illegal tying in violation of

5    Section 1 of the Sherman Act by tying Visa credit card network processing services to the Visa

6    credit card system (or alternatively, major credit card or general purpose card systems).  Visa's

7    tying mechanisms have included maintaining mandatory processing guarantee fees to member

8    banks to support Visa's proprietary network processing services, regardless of whether Visa's

9    network processing services are actually used, maintaining transaction processing fee volume

10   discounts that reward a customer only for processing *all* of its transactions using Visa's network

11   processing services, banning Private Arrangements altogether, implementing the MDEX pricing

12   structure, and requiring acquirers to promote MDEX and use VisaNet as a condition of receiving

13   the substantial financial benefits of the VAPP program.  Visa's mandatory fees, its fee structure

14   and its ban on Private Arrangements force member banks to pay for Visa's credit card network

15   processing services if they wish to use the Visa credit card system.

16        137.    The Visa credit card system (or alternatively, major credit card or general purpose

17   card network systems) and Visa's credit card network processing services are two separate

18   products.  Access to the Visa credit card system (or alternatively, major credit card or general

19   purpose credit card network systems) is conditioned upon purchase of (or at least a payment for)

20   credit card network processing services provided by Visa, such that an agreement to use Visa's

21   credit card system constitutes an agreement to use Visa's credit card network processing services

22   or to forego using a competitor's services.

23        138.    Visa has sufficient economic power in the tying market to impose significant

24   restrictions in the tied market.  This economic power is shown by, *inter alia*, Visa's 99% market

25   share of Visa card transactions, its 57% market share of major credit card transactions, its 42%

26   market share of the purchase volume of general purpose card transactions, and its unique Visa

1   brand, in combination with its demonstrated power to impose tie-ins and to price discriminate.  A

2   substantial amount of interstate commerce in Visa credit card network processing services is

3   affected by these arrangements.  These arrangements cannot be justified as serving a

4   competitively reasonable purpose.  Furthermore, Visa has an economic interest in its Visa credit

5   card network processing services.

6        139.    These tie-ins prevent competition from other processors and merchant-acquirers

7   such as First Data which now have the ability to authorize and settle transactions without using

8   Visa's networks, by making it economically irrational for banks to seek out lower prices for

9   credit card network processing services for Visa transactions.

10        140.    As a direct and proximate result of Visa's illegal tying, consumers and

11   competition in the relevant market have been injured, and First Data has lost profits and has been

12   harmed in that (1) it is constrained from expanding its offerings and from adequately providing

13   its current services in the Visa credit card network processing services market; (2) its goodwill

14   and reputation are thereby harmed; and (3) it is unable to recoup its investment costs of many

15   millions of dollars in making its Omaha, Denver and Hagerstown computer platforms interface

16   so as to allow internal processing of authorization and settlement transactions of Visa

17   transactions that are processed by both FDR and FDMS.

18        141.    The harm to First Data from these activities is ongoing and cumulative, and is not

19   susceptible to full relief via monetary compensation, leaving First Data no adequate remedy at

20   law.  The amount of such injury is difficult to calculate, but could amount to hundreds of

21   millions of dollars over time.

22                              **FIFTH CAUSE OF ACTION:**

23                    **SHERMAN ACT, SECTION 1 – TYING (DEBIT)**

24        142.    First Data incorporates paragraphs 1 through 80 of the preceding allegations  as

25   though fully set forth here.

26

143.    The card systems that include the brands, rules and protocols for conducting debit card transactions (*i.e.*, that provide the infrastructure and mechanisms for conducting debit transactions, provide merchant acceptance of debit card brands, and directly or indirectly establish merchant discount rates) ("debit card systems") constitute a relevant tying product market.

144.    Visa has market power in the debit card systems market.  Visa processes approximately 60% of transactions in this market.

145.    Debit card network processing services constitute the relevant tied market.  Visa requires issuers and merchant-acquirers who use its debit card system to purchase its debit card network processing services or to forego purchasing a competitor's debit card network processing services.

146.    Visa debit card network processing services are the relevant tied product in the tied market.

147.    Visa's market power in the relevant tying product market is demonstrated by the inability of merchants to decline to accept Visa-branded debit cards; Visa's ability to price discriminate among merchants; and the barriers to entry in the relevant market.  Visa also has the ability to price discriminate among issuers.  It does this by charging tiered transaction fees, allowing larger issuers to pay substantially lower fees for transaction processing.  It also discriminates by granting certain of its issuers incentives (whether in the form of bonuses, rebates, market allowances or discounts) to issue debit cards under the Visa brand and use its myriad products and services.  Almost all of the Visa members that have received these special deals have representatives on the Visa Board.

148.    Visa has engaged in and continues to engage in illegal tying in violation of Section 1 of the Sherman Act by tying debit card systems to Visa debit card network processing services.  Visa's tying mechanisms have included maintaining mandatory processing guarantee fees to member banks to support Visa's proprietary network processing services, regardless of

FIRST AMENDED COUNTERCLAIM

1 whether Visa's network processing services are actually used, maintaining transaction processing

2 fee volume discounts that reward a customer only for processing *all* of its transactions using

3 Visa's network processing services, banning Private Arrangements altogether, and implementing

4 the MDEX pricing structure.  Visa's mandatory fees, its fee structure and its ban on Private

5 Arrangements force member banks to pay for Visa's debit card network processing services if

6 they wish to use Visa's debit card system.

7   149. Debit card network systems and Visa debit card network processing services are

8 two separate products.  Access to Visa's debit card system is conditioned upon purchase of (or at

9 least a payment for) debit card network processing services provided by Visa, such that an

10 agreement to use Visa's debit card system constitutes an agreement to use Visa's debit card

11 network processing services or to forego using a competitor's debit card network processing

12 services.

13   150. Visa has sufficient economic power in the tying market to impose significant

14 restrictions in the tied market.  This economic power is shown by, *inter alia*, Visa's approximate

15 60% market share of debit card transactions and its unique Visa brand, in combination with its

16 demonstrated power to impose tie-ins and to price discriminate.  A substantial amount of

17 interstate commerce in debit card network processing services is affected by these arrangements.

18 These arrangements cannot be justified as serving a competitively reasonable purpose.

19 Furthermore, Visa has an economic interest in its debit card network processing services.

20   151. These tie-ins prevent competition from other processors and merchant-acquirers

21 such as First Data which now have the ability to authorize and settle transactions without using

22 VisaNet, by making it economically irrational for banks to seek out lower prices for debit card

23 network processing services for Visa transactions.

24   152. As a direct and proximate result of Visa's illegal tying, consumers and

25 competition in the relevant market have been injured, and First Data has lost profits and has been

26 harmed in that (1) it is constrained from expanding its offerings and from adequately providing

1   its current services in the debit card network processing services market; (2) its goodwill and

2   reputation are thereby harmed; and (3) it is unable to recoup its investment costs of many

3   millions of dollars in making its Omaha, Denver and Hagerstown computer platforms interface

4   so as to allow internal processing of authorization and settlement transactions of Visa

5   transactions that are processed by both FDR and FDMS.

6       153.    The harm to First Data from these activities is ongoing and cumulative, and is not

7   susceptible to full relief via monetary compensation, leaving First Data no adequate remedy at

8   law.  The amount of such injury is difficult to calculate, but could amount to hundreds of

9   millions of dollars over time.

10                          **SIXTH CAUSE OF ACTION:**

11          **SHERMAN ACT, SECTION 1 – CONCERTED REFUSAL TO DEAL**

12      154.    First Data incorporates paragraphs 1 through 80 of the preceding allegations as

13   though set forth here.

14      155.    Visa is owned and effectively operated by approximately 14,000 banking

15   institutions nationally, which serve as members of VisaNet system, and which compete with one

16   another in the issuance of payment cards and the acquiring of merchants' transactions.  Visa's

17   member banks both set Visa's policies and agree to abide by Visa's by-laws and other

18   regulations.  As such, Visa is not a single entity, but rather a consortium of competitors.

19      156.    Visa, acting through its members, has engaged in and continues to engage in a

20   concerted refusal to deal in violation of Section 1 of the Sherman Act.  Competing banks that

21   comprise Visa have agreed not to enter into "Private Arrangements" with First Data, and have

22   implemented a pricing structure that penalizes those who purchase processing-related services

23   from First Data.  Visa's August 28, 2002 decision to ban its member banks from using First Data

24   intra-processing services constituted an explicit concerted agreement to boycott First Data.

25      157.    Visa's member institutions have created a horizontal restraint – an agreement

26   among competitors on the way in which they will compete with one another, unreasonably

                                    39                    Case No. C 02-1786-JSW
                        **FIRST AMENDED COUNTERCLAIM**

1   restraining trade.  A substantial amount of interstate commerce in Visa credit card network

2   processing services (or alternatively, major credit card or general purpose credit card network

3   processing services) and debit card network processing services is affected by Visa's ban on

4   Private Arrangements.  This is a per se offense.

5        158.    In the alternative, under the rule of reason, Visa possesses market power in the

6   Visa credit card network processing services market (or alternatively, the major credit card or

7   general purpose credit card network processing services market) and the debit card network

8   processing services market, and its group boycott has blocked First Data from competing to

9   provide Visa credit card and Visa debit card network processing services.  Visa's actions have

10   had a substantial adverse effect on competition in those markets.  Visa's actions are not

11   reasonably necessary to achieve any procompetitive justifications.

12        159.    As a direct and proximate result of Visa's illegal group boycott, consumers and

13   competition in the relevant markets have been injured, and First Data has lost profits and has

14   been harmed in that (1) it is constrained from expanding its offerings and from adequately

15   providing its current services in the Visa credit card network processing services market (or

16   alternatively, the major credit card or general purpose credit card network processing services

17   market) and the debit card network processing services market; (2) its goodwill and reputation

18   are thereby harmed; and (3) it is unable to recoup its investment costs of many millions of dollars

19   in making its Omaha, Denver and Hagerstown computer platforms interface so as to allow

20   internal processing of authorization and settlement transactions of Visa transactions that are

21   processed by both FDR and FDMS.

22        160.    The harm and lost profits to First Data from these activities is ongoing and

23   cumulative, and is not susceptible to full relief via monetary compensation, leaving First Data no

24   adequate remedy at law.  The amount of such injury is difficult to calculate, but could amount to

25   hundreds of millions of dollars over time.

26

1

**SEVENTH CAUSE OF ACTION:**

2

**CARTWRIGHT ACT, BUS. & PROF. CODE SECTIONS 16700** *et seq.*

3      161.    First Data incorporates paragraphs 1 through 80, 124 through 138, and 140

4  through 150 of the preceding allegations as though fully set forth here.

5      162.    Visa has also engaged in illegal acts of coercion and intimidation by disparaging

6  First Data's services, falsely implying that First Data Net is inadequate and unsafe for use by

7  Visa Members, and by threatening First Data participants.  Visa did this in an attempt to force

8  issuers to refuse to use First Data's Visa credit card and debit card network processing services.

9  Visa has also attempted to force its members to refrain from using First Data Net by banning

10  new Private Arrangements.

11      163.    As a direct and proximate result of Visa's illegal tying and coercive conduct,

12  consumers and competition in the relevant markets have been injured, and First Data has been

13  harmed in that (1) it is constrained from expanding its offerings and from adequately providing

14  its current services in the Visa credit card network processing services market and in the debit

15  card network processing services market; (2) its goodwill and reputation are thereby harmed; and

16  (3) it is unable to recoup its investment costs of many millions of dollars in making its Omaha,

17  Denver and Hagerstown computer platforms interface so as to allow internal processing of

18  authorization and settlement transactions of Visa transactions that are processed by both FDR

19  and FDMS.

20      164.    The harm and lost profits to First Data from these activities is ongoing and

21  cumulative, and is not susceptible to full relief via monetary compensation, leaving First Data no

22  adequate remedy at law.  The amount of such injury is difficult to calculate, but could amount to

23  hundreds of millions of dollars over time.

24      165.    Visa's conduct in engaging in illegal tying and coercion violates the Cartwright

25  Act, Cal. Bus. & Prof. Code § 16700 *et seq.*

26

FIRST AMENDED COUNTERCLAIM

SF/21574725.1

**EIGHTH CAUSE OF ACTION:**

**CALIFORNIA UNFAIR COMPETITION LAW,**

**CALIFORNIA BUS. & PROF. CODE § 17200** *et seq.*

166.     First Data incorporates each and every one of the preceding allegations as though fully set forth here.

167.     The acts and practices alleged in this Complaint violate numerous provisions of California law and United States law, constituting unlawful business acts and practices:

a)     Visa's prohibition on First Data against launching First Data Net and thus against expanding its offerings in the Visa credit card (or alternatively, major credit card) network processing services market, Visa's imposition of processing guarantee, tiered transaction processing and assessment fees, Visa's exclusion of First Data from its RED Working Group and Member Call Program, Visa's changed documentation requirements, Visa's "honor all cards" rule, Visa's threats against First Data Net participants,  Visa's MDEX pricing, and Visa's VAPP program violate the Sherman Act, Section 2 as acts of willfully maintaining its monopoly power;

b)     Visa's prohibition on First Data's launching of First Data Net and thus against expanding its offerings in the Visa credit card (or alternatively, major credit card or general purpose credit card) network processing services markets, and in the debit card network processing services market, Visa's imposition of processing guarantee, tiered transaction processing and assessment fees, Visa's exclusion of First Data from its RED Working Group and Member Call Program, Visa's changed documentation requirements, Visa's "honor all cards" rule, Visa's threats against First Data Net participants,  Visa's MEDx pricing, and Visa's VAPP program violate the Sherman Act, Section 2 as acts of willfully attempting to gain its monopoly power;

c)     Visa's ban on Private Arrangements and its setting of mandatory processing guarantee fees and transaction processing fee volume discounts violates the Sherman Act,

FIRST AMENDED COUNTERCLAIM

1    Section 1 as an act of tying;

2    d)    Visa's ban on Private Arrangements and its setting of mandatory processing

3    guarantee fees and transaction processing fee volume discounts, and its coercion and

4    intimidation of First Data's customers and prospective customers violate the Cartwright

5    Act, Cal. Bus. & Prof. Code § 16700 *et seq.* as an act of tying;

6    e)    Visa's statements to First Data's customers and prospective customers

7    disparaging First Data's Visa credit and debit card network processing services and its

8    ability to provide high-quality Visa credit and debit card network processing services

9    violate Section 43(a) of the Lanham Act;

10    f)    Visa's statements to First Data's customers and prospective customers

11    disparaging First Data's Visa credit and debit card network services and its ability to

12    provide high-quality Visa credit and debit card network services violate California

13    common law of defamation;

14    g)    Visa's statements to First Data's customers and prospective customers

15    disparaging First Data's Visa credit and debit card network services and its ability to

16    provide high-quality Visa credit and debit card network services violate California

17    common law of trade libel;

18    h)    Visa's statements to First Data's customers and prospective customers

19    disparaging First Data's Visa credit and debit card network processing services and its

20    ability to provide high-quality Visa card and debit card network processing services

21    violate California common law of interference with prospective economic advantage;

22    i)    Visa's "honor all cards" rule violates the Sherman Act, Section 2 as an act of

23    monopolization or an attempt to monopolize;

24    j)    Visa's ban on Private Arrangements, its setting of mandatory processing

25    guarantee fees and transaction processing discounts, its MDEX pricing, and its VAPP

26    program violate the Sherman Act, Section 1 as acts of concerted refusal to deal.

FIRST AMENDED COUNTERCLAIM

1        k)      Visa's sale of network processing services at a higher price to those customers

2        who do not use Visa's new MDEX service, or who purchase merchant processing-related

3        services from third-party merchant processors.

4  Such conduct is ongoing and continues to this date.

5        168.    The acts and practices alleged in this Complaint constitute unfair business

6  practices because they constitute conduct that threatens an incipient violation of federal and

7  California antitrust laws, and violate the policy or spirit of those laws, because the effects of the

8  conduct are comparable to or the same as a violation of the laws.  Such conduct is ongoing and

9  continues to this date.

10       169.    Visa's statements to First Data's customers and prospective customers

11  disparaging First Data's intra-processing services and its ability to provide high-quality network

12  processing services constitute fraudulent business acts or practices because members of the

13  public are likely to be deceived by Visa's false and misleading  statements.  Such conduct is

14  ongoing and continues to this date.

15       170.    Visa's statements to First Data's customers and prospective customers

16  disparaging First Data's intra-processing services and its ability to provide high-quality network

17  processing services evidence its malicious intent to injure First Data and constitute unfair,

18  deceptive, untrue and misleading advertising because members of the public are likely to be

19  deceived by the false and misleading statements.  Such conduct is ongoing and continues to this

20  date.

21       171.    As a direct and proximate result of Visa's conduct, consumers and competition in

22  the relevant markets have been injured, and First Data has been harmed in that (1) it is

23  constrained from expanding its offerings and from adequately providing its current services in

24  the Visa credit card network processing services market (or alternatively, the major credit card or

25  general purpose card network processing services market) and the debit card network processing

26  services market; (2) its goodwill and reputation are thereby harmed; and (3) it is unable to recoup

FIRST AMENDED COUNTERCLAIM

1   its investment costs of many millions of dollars in making its Omaha, Denver and Hagerstown

2   computer platforms interface so as to allow internal processing of authorization and settlement

3   transactions of Visa transactions that are processed by both FDR and FDMS.

4       172.    Visa has been unjustly enriched because it continues to make profits without fair

5   competition.

6       173.    Visa's unfair and unlawful business acts and practices violate California Unfair

7   Competition laws, Cal. Bus. & Prof. Code Sections 17200 *et seq.*

8   <center>**NINTH CAUSE OF ACTION:**</center>

9   <center>**DEFAMATION**</center>

10       174.    First Data incorporates paragraphs 1 through 80 of the preceding allegations as

11   though fully set forth here.

12       175.    First Data has at all times enjoyed a good business reputation.

13       176.    Visa's acts of contacting First Data's customers and prospective customers to

14   disparage First Data's intra-processing and First Data's ability to provide high-quality network

15   services constitute common-law defamation.  On information and belief, Visa's statements are

16   false and defamatory in meaning and have been published to third parties who understand the

17   defamatory meaning and the applicability of the statements to First Data.  These statements have

18   been and continue to be made maliciously and fraudulently and are not privileged.  These

19   statements have caused and continue to cause injury to First Data's business reputation.

20       177.    On information and belief, since January 2002, Visa has willfully, without

21   justification and without privilege published to other persons letters, electronic mail messages,

22   and oral representations which disparaged and continue to disparage First Data's services by

23   falsely implying that First Data Net is inadequate and unsafe for use by Visa Members.  For

24   example, on April 16, 2002, Visa sent a memorandum to all Visa U.S.A. Members stating that

25   Visa sued First Data because "the issues presented by a Private Arrangement go to the heart of

26   the branded Visa payment service itself on which members, consumers, and merchants rely -- its

<center>45</center>

1   quality, integrity, predictability, and reliability."  The vast majority of these members were not

2   involved in the initial stage of First Data Net, and Visa did not attempt to limit its missive to the

3   three members participating in the initial stage.  These statements were made with the intent to

4   mislead third parties about the ability of First Data to adequately and securely serve its

5   customers.  The statements misrepresent the nature, characteristics and qualities of First Data's

6   network processing services and have a tendency to deceive or confuse members of the public,

7   including current and potential customers of First Data.  Furthermore, because First Data has

8   done significant acquiring and processing of Visa transactions for over 27 years, it is false for

9   Visa to express (now that has determined to stop First Data from offering First Data Net) a

10   concern about "quality, predictability, and reliability."

11        178.   These statements are false as they pertain to First Data.

12        179.   These statements are slanderous and libelous on their face.  They expose First

13   Data to contempt and obloquy because they impugn First Data's business reputation and its

14   ability to serve its customers.

15        180.   Visa sent these statements both to Visa members who are First Data customers

16   and all other Visa members in the United States, evidencing Visa's malicious intent to injure

17   First Data.

18        181.   As a direct and proximate result of Visa's defamatory statements, First Data's

19   business reputation has been injured, resulting in the loss of current and potential customers and

20   profits, and harming its goodwill and reputation.

21        182.   The harm to First Data from Visa's defamatory activities is ongoing and

22   cumulative, and is not susceptible to relief via monetary compensation, leaving First Data no

23   adequate remedy at law.  The amount of such injury is difficult to calculate, but could amount to

24   hundreds of millions of dollars over time.

25

26

**TENTH CAUSE OF ACTION:**

**TRADE LIBEL**

183.     First Data incorporates paragraphs 1 through 80 of the preceding allegations as though fully set forth here.

184.     First Data has at all times enjoyed a good business reputation.

185.     On information and belief, since January 2002, Visa has willfully, without justification and without privilege published to other persons letters, electronic mail messages and oral representations, which disparaged and continue to disparage First Data's services by falsely implying that First Data Net is inadequate and unsafe for use by Visa members.  For example, on April 16, 2002, Visa sent a memorandum to all Visa U.S.A. Members explaining that Visa sued First Data because "the issues presented by a Private Arrangement go to the heart of the branded Visa payment service itself on which members, consumers, and merchants rely -- its quality, integrity, predictability, and reliability."  The vast majority of these members were not involved in the initial stage of First Data Net, and Visa did not attempt to limit its missive to the three members participating in the initial stage.  These statements were made with the intent to mislead third parties about the ability of First Data to adequately and securely serve its customers.  The statements misrepresent the nature, characteristics and qualities of First Data's network processing services and have a tendency to deceive or confuse members of the public, including current and potential customers of First Data.  Furthermore, because First Data has done significant acquiring and processing of Visa transactions for over 27 years, it is false for Visa to express (now that has determined to stop First Data from offering First Data Net) a concern about "quality, predictability, and reliability."

186.     These statements are false as they pertain to First Data.

187.     As a direct and proximate result of Visa's publication of the statements, prospective customers have been deterred from purchasing First Data's services and from otherwise dealing with First Data, and First Data has thereby suffered injury to its business and

Case No. C 02-1786-JSW

FIRST AMENDED COUNTERCLAIM

SF/21574725.1

1   pecuniary loss to be determined at trial.  The amount of such injury is difficult to calculate, but

2   could amount to hundreds of millions of dollars over time.

3                          **ELEVENTH CAUSE OF ACTION:**

4            **INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

5            188.    First Data incorporates paragraphs 1 through 80 of the preceding allegations as

6   though fully set forth here.

7            189.    Visa's acts of contacting First Data's customers and prospective customers to

8   disparage First Data's Visa network processing services and First Data's ability to provide

9   adequate Visa network processing services, and Visa's acts of monopolization, attempt to

10  monopolize, tying, and concerted refusal to deal, as alleged above, constitute tortious

11  interference with First Data's prospective economic advantage.  First Data has an expectancy of

12  future contractual relationships with issuers for whom First Data processes.

13           190.    Visa knew of the above expectancy of contractual relationships in that it knew

14  that  First Data has relationships with banks who currently employ its network processing

15  services and who use First Data Net.

16           191.    On information and belief, since January 2002, Visa has willfully, without

17  justification and without privilege published to other persons letters, electronic mail messages

18  and oral representations, which disparaged and continue to disparage First Data's services by

19  falsely implying that First Data Net is inadequate and unsafe for use by Visa members.  For

20  example, on April 16, 2002, Visa sent a memorandum to all Visa U.S.A. Members explaining

21  that Visa sued First Data because "the issues presented by a Private Arrangement go to the heart

22  of the branded Visa payment service itself on which members, consumers, and merchants rely --

23  its quality, integrity, predictability, and reliability."  These statements were made with the intent

24  to mislead third parties about the ability of First Data to adequately and securely serve its

25  customers and with the intent to injure First Data.  The statements misrepresent the nature,

26  characteristics and qualities of First Data's network processing services and have a tendency to

SF/21574725.1

1   deceive or confuse members of the public, including current and potential customers of First

2   Data.  Furthermore, because First Data has done significant acquiring and processing of Visa

3   transactions for over 27 years, it is false for Visa to express (now that has determined to stop

4   First Data from offering its enhanced service) a concern about "quality, predictability, and

5   reliability."

6          192.    Visa's false representations constitute an unfair and fraudulent business act or

7   practice in violation of California Business and Professions Code Sections 17200 *et seq.*

8          193.    Visa has attempted and continues to attempt to interfere with these prospective

9   economic relationships by wrongfully and tortiously defaming First Data and thereby deceiving,

10   confusing and misguiding First Data's potential customers, in order to induce First Data's

11   potential customers to refuse to employ First Data's services.  Visa's acts are wrongful, knowing,

12   willful and malicious and constitute intentional interference with First Data's economic and other

13   relationships with prospective customers.

14          194.    As a direct and proximate result of Visa's acts, First Data has suffered and

15   continues to suffer damages, including, without limitation, a loss of potential customers and

16   profits for First Data Net.  The amount of such injury is difficult to calculate, but could amount

17   to hundreds of millions or billions of dollars over time.   In addition, Visa's acts of interference

18   with prospective economic advantage have caused and are causing irreparable and incalculable

19   injury to First Data and to the goodwill and reputation represented thereby, and unless enjoined

20   will cause further irreparable and incalculable injury, leaving First Data no adequate remedy at

21   law.

22                          **TWELFTH CAUSE OF ACTION**

23                              **BREACH OF CONTRACT**

24          195.    First Data incorporates paragraphs 1 through 80 of the preceding allegations as

25   though fully set forth here.

26

1      196.    First Data and Visa have entered into contracts including an agreement wherein

2    Visa has grandfathered-in First Data's intra processing arrangements and exempted them from

3    the notice and approval requirements its regulations impose on so-called "Private

4    Arrangements."  First Data and Visa have also entered into so-called "VisaNet Letter

5    Agreements" in September 2001.

6      197.    By reason of the foregoing facts, a duty of good faith and fair dealing exists

7    between Visa and First Data.

8      198.    Visa has breached the grandfather agreement by claiming that First Data has

9    failed to obtain its approval for First Data Net.

10      199.    In the alternative, Visa has breached the duty of good faith and fair dealing by

11    wrongfully and in bad faith withholding its approval of First Data Net.

12      200.    Visa's wrongful conduct has caused and continues to cause great and irreparable

13    injury to First Data.  First Data has no adequate remedy at law for the injuries it is currently

14    suffering and will continue to suffer.  Unless enjoined, Visa will further diminish the value of

15    First Data Net and First Data's goodwill over time.  The amount of such injury is difficult to

16    calculate, but could amount to hundreds of millions of dollars over time.

17                     **PRAYER FOR RELIEF**

18    Wherefore, First Data prays that the Court award relief as follows:

19        1.    That judgment be entered against Visa USA and in favor of First Data;

20        2.    For an injunction enjoining Visa USA from adopting or implementing any

21    rule prohibiting First Data from conducting intra-processing or otherwise having the effect of

22    frustrating First Data's efforts to conduct intra-processing, from making false and misleading

23    statements to current and potential customers of First Data, and from implementing the "honor

24    all cards" rule;

25

26

SF/21574725.1

1    3.    For an injunction enjoining Visa USA from enforcing U.S. Registration

2  No. 2803570 for the VISA mark and/or from using the mark VISA to prevent third parties from

3  offering network processing services for Visa transactions;

4    4.    Damages in a sum to be determined at trial, to be trebled as appropriate

5  under the law;

6    5.    Restitution and disgorgement of sums obtained by Visa USA through its

7  anticompetitive conduct;

8    6.    Punitive damages in an amount deemed appropriate by the Court;

9    7.    An award to First Data of its attorney's fees, costs, and disbursements in

10  this action; and

11    8.    Such other and further relief as the Court deems just and proper.

12

DATED:  August 12, 2004

13

14                    BINGHAM McCUTCHEN LLP

15

16

                    By: /s/ Geraldine M. Alexis

17                         Geraldine M. Alexis
                         Beth H. Parker
18                         David P. Chiappetta
                         Jonathan Hersey
19                         Raymond Lara
                         Victoria Wong
20                    Attorneys for Defendants and Counterclaimants
                    First Data Corporation, First Data
21                    Resources Inc. and First Data
                    Merchant Services Corporation
22

23

24

25

26
                                   51
                    FIRST AMENDED COUNTERCLAIM

SF/21574725.1