**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VISA U.S.A. INC., a Delaware corporation, | |
| Plaintiff and Counterdefendant, | No. C 02-01786 JSW |
| v. | |
| FIRST DATA CORPORATION, a Delaware corporation; FIRST DATA RESOURCES, INC., a Delaware corporation; and FIRST DATA MERCHANT SERVICES CORPORATION, a Florida corporation, | **ORDER DENYING VISA'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Defendants and Counterclaimants. | |

Now before the Court is Visa's motion for partial summary judgment. Visa moves this Court for an order finding that (1) First Data lacks antitrust standing to challenge certain of Visa's regulations; (2) First Data improperly seeks damages outside of the relevant markets; (3) First Data's attempted monopolization claim in the debit market fails as a matter of law; and (4) each of four independent allegations in the counterclaim fails to constitute an independent antitrust violation and should therefore be adjudged in Visa's favor. Having carefully read the parties' papers and considered the arguments and the relevant legal authority, the Court hereby DENIES Visa's motion.

## BACKGROUND

The extensive facts are familiar to the parties and to the Court and have been recited extensively in previous orders. The Court will address the specific facts relevant to this motion as they are pertinent to the analysis.

# ANALYSIS

**A.      Legal Standard on Summary Judgment.**

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A party moving for summary judgment who does not have the ultimate burden of persuasion at trial, must produce evidence which either negates an essential element of the non-moving party's claims or show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). A party who moves for summary judgment who does bear the burden of proof at trial, must produce evidence that would entitle him or her to a directed verdict if the evidence went uncontroverted at trial. *C.A.R. Transp. Brokerage Co., Inc. v. Darden*, 213 F.3d 474, 480 (9th Cir. 2000).

Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). It is not the Court's task to "scour the record in search of a genuine issue of triable fact." *Id.* (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323. An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility

determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 723, 735 (9th Cir. 1997).

**B.     Antitrust Standing Regarding Visa's "Honor All Cards" Rules.**

   **1.     First Data's Allegations in the Second Amended Counterclaim.**

First Data's Second Amended Counterclaim includes causes of action for monopolization and attempted monopolization. First Data alleges that its claims relate to the Visa credit card network processing services market (for its first cause of action for monopolization) and/or the general purpose credit card network processing services market (for its second cause of action for attempted monopolization in the credit card industry) and/or the debit card network processing services market (for its third cause of action for attempted monopolization in the debit card industry). (*See* Second Amended Counterclaims ("SACC"), ¶¶ 82, 100, 111.) First Data, as a seller in the Visa credit card network processing services market, posits that, among other actions, Visa has willfully maintained its monopoly power in the relevant market by: (1) demanding that First Data comply with unreasonable conditions before approving the First Data Net pilot for Visa transactions; (2) subsequently banning the implementation of First Data Net and all new Private Arrangements, with the intent of blocking First Data's competition in providing credit card network processing services for Visa transactions; and (3) blocking competition on interchange fees and merchant discounts through its "honor all cards" rule and its associated no discounts rule and its ban on intra-processing. (*See id.*, ¶ 89.) As a result of this and other alleged conduct, First Data asserts that it has been injured in that (1) it is constrained from expanding its offerings and from adequately providing its current services in the relevant market; (2) its goodwill and reputation are thereby harmed; (3) it is forced to pay an overcharge on interchange reimbursement fees and processing fees that it would not have had to pay but for Visa's anticompetitive conduct; and (4) it has lost profits from the potential intra-processing transaction of its clients. (*See id.*, ¶ 97.)

First Data contends that the ban on point of sale discounts and promotion removes incentives for banks to enter into bilateral interchange agreements and thus stifles price competition among horizontal competitors. (*See* Opp. at 8; *see also* SACC ¶ 78.) Moreover,

First Data contends that, in combination with the intra-processing ban which has the effect of preventing First Data from facilitating those agreements, Visa's regulations limiting discounts at point of sale is anticompetitive. (*See* SACC ¶ 80 (alleging that the "'honor all cards' rule is anticompetitive and harms third-party providers of network processing services, such as First Data. It also harms FDMS [First Data Merchant Services Corporation] as a merchant acquirer because it pays artificially high interchange fees. In the absence of the 'honor all cards' rule and Visa's other anticompetitive practices, First Data would be able to compete to provide Visa credit card and debit card network processing services. For example, it could work with merchants and issuers to offer discounts and incentives for the use of cards for which First Data provides intra-processing. This would provide savings in the form of lower interchange fees to merchant acquirers. Some of these savings would be passed on to merchants, and ultimately to consumers in the form of lower retail prices.")

First Data's economic expert, Professor Hausman attempts to calculate damages by comparing the actual interchange rates charged to those that ostensibly would have been charged absent Visa's exercise of market power as alleged by First Data in its counterclaims. (*See* Declaration of Jerry A. Hausman ("Hausman Decl."), Ex. B at ¶ 36.)

### 2. Visa's Rules and Regulations.

Visa alleges that First Data's challenge to the "Honor All Cards" rule fails because First Data lacks antitrust standing to make such a challenge. Among many other rules in Visa's extensive operating regulations, Visa adopted what it calls the "Honor All Cards" rule whereby merchants desiring to accept any Visa-branded payment card must accept all Visa-branded payment cards. An associated aspect of the "Honor All Cards" rule precludes, subject to some exceptions, point of sale discounts or preferences to some Visa issuers' cards over other issuers' cards. (*See* Declaration of Sujal J. Shah ("Shah Decl."), Ex. I; Supplemental Declaration of Sujal J, Shah, Ex. I; *see also* Declaration of Aaron S. Edlin, Ph.D. ("Edlin Decl."), Ex. E at ¶ 46.)

4

### 3. First Data's Theory of Damages Related to Point of Sale Discounts.

First Data alleges that absent Visa's mandatory rules on non-discrimination and limitation of discounts, merchants or groups of merchants could more effectively form agreements with issuers or groups of issuers to steer customers toward certain cards by providing point of sale discounts in exchange for lower interchange fees. First Data points to evidence in the record to support the contention that Visa intended to limit competition by enforcing the no discounts rule. (*See* Shah Decl., Ex. J (internal Visa memo indicating that, in deciding to enforce the no discounts rule, Visa was concerned with "competitive tactics" and the potential for "merchant[s] [to] start to drive deals to move volume"); *see also* Edlin Decl., Ex. C at ¶ 46 (First Data's expert opining that preclusion of point of sale discounts "tends to make it more difficult for an issuer to increase its volume by competing with lower interchange fees, and thereby discourages competition in interchange fees."). In this regard, First Data contends that the rule does in fact discourage competition in interchange fees, resulting in, among other things, the payment of inflated fees by First Data. *Id.* at ¶ 78 (opining that the "ban on network processing and the anticompetitive aspects of the Honor-All-Cards rule discussed earlier, particularly in tandem, have a significant potential to limit interchange competition among Visa issuers. Interchange competition among Visa issuers would occur if a given issuer or group of issuers were able to arrange with a given merchant or group of merchants to trade lower interchange for promotions that generated a sufficient increase in volume for the issuers."); *see also* Shah Decl., Ex. L (Edlin Depo.) at 178:8-15).

An aspect of First Data's theory of damage is that the proliferation of Visa's Honor All Cards rule and limitation on point of sale discounts, in combination with the ban on network processing, works to maintain a supra-competitive interchange structure by preventing issuing banks from competing over merchant business which might have the overall effect of requiring Visa to lower its interchange fees. Again, First Data calculates its damages as the difference

between the actual, allegedly supra-competitive interchange fees it is required to pay and those fees that ostensibly would have been charged absent Visa's exercise of market power.[1]

### 4. Visa's Position Regarding Standing.

Visa contends that First Data lacks standing to pursue its claims against Visa's rules and regulations governing the availability of point of sale discounts. Visa argues that First Data's alleged injury suffered in its role as "intraprocessor" of Visa transactions is too remote to warrant antitrust standing. Second, Visa contends that First Data, in its role as an "acquirer" of Visa transactions, is not the appropriate party to challenge the alleged imposition of Visa's regulations on merchants. (*See* Motion at 13.) Visa contends that its regulations are directed to merchants, and require only that merchants accept all Visa cards in a non-discriminatory basis. Visa therefore maintains that any possible injury to or limitation on competition would result in harm to merchants, and not to intraprocessors, and that any harm allegedly suffered by First Data would only have been caused derivatively, or remotely, by the alleged violation. (*See id.* at 14-15.) Similarly, Visa contends that First Data lacks standing to assert its claims against the regulations in its status as an acquirer because, again, although the alleged restraint on merchants may, taking First Data's allegations as true, have an incidental effect on the level of the interchange fee, that confuses a direct attack on interchange fees with an attack on the independent process of setting non-discrimination regulations. Visa contends that First Data's attack on the regulations governing conduct by merchants merely sets the level of the interchange fee as a measure of damages and is not a direct attack on the interchange. (*See id.* at 17.)

The Court finds, however, that there remain questions of fact regarding the relationship between First Data's harm and the alleged wrongdoing by Visa. First Data contends that the

---

[1] First Data also contends that the legality of the default interchange rate depends, at least in part, on the viability of those alternative agreements. *See National Bankcard Corp. (NaBanco) v. Visa, U.S.A.*, 596 F. Supp. 1231, 1264 (S.D. Fla. 1984) (noting that the interchange fee is not mandatory because "NaBanco is and always has been free to negotiate different terms of interchange, and Visa issuers have been willing to make alternative arrangements."); *see also National Bankcard Corp. (NaBanco) v. Visa, U.S.A.*, 779 F.2d 592, 594 (11th Cir. 1986) (finding it significant that "the parties to the interchange are not required to use BASE II [Visa's computerized service]. Merchant and issuer institutions are free to negotiate a different rate and bypass the BASE II system entirely.")

intraprocessing ban and the rule limiting discounts, separately and acting in tandem, preserve and enforce what it contends represents an interchange cartel maintained by Visa. First Data contends that the rules effectively restrain Visa members from entering into bilateral agreements which might otherwise undercut the default interchange rate set by the Visa Board. The issue of whether Visa's regulations limiting the scope and availability of discounts at point of sale as well as other practices, in concert with its ban on intraprocessing, causes members not to negotiate separate interchange agreements and whether those agreements would have lowered the overall interchange fee, is a question of fact. The Court finds that First Data has made sufficient and factually supportable allegations regarding the combined acts of Visa to afford it antitrust standing to submit the issue for resolution to a jury.[2]

### 5. Antitrust Standing.

The class of persons who may maintain a private damage action under the antitrust laws is broadly defined in Section 4 of the Clayton Act, which provides in pertinent part: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold damages by him sustained." 15 U.S.C. § 15. "A literal reading of the statute is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation." *Associated General Contractors of California v. California State Council of Carpenters ("AGC")*, 459 U.S. 519, 529 (1983). However broadly described, it "is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages

---

[2] Further, Visa's argument is improper for an independent reason because it attempts to segregate the various allegations of anticompetitive conduct. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (holding that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.") The allegations in the second amended counterclaim include both the ban on intraprocessing and the enforcement of Visa's regulations limiting discounts at the point of sale. The contention is that both actions by Visa, in tandem and in combination with other conduct, have worked to effectuate an unlawful restraint of trade.

7

for the injury to his business or property." *Blue Shield of Virginia, Inc. v. McCready*, 457 U.S. 465, 477 (1982).

The plaintiff must have antitrust standing and to determine whether that requirement is met, the Court must "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *ACG*, 459 U.S. at 535. The Ninth Circuit has summarized the factors relevant to a finding of antitrust standing as follows: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity of apportioning damages." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000) (quoting *American Ad Mgmt. v. General Tel. Co.*, 190 F.3d 1051, 1054-55 (9th Cir. 1999)). To conclude that there is antitrust standing, the Court need not find in favor of the plaintiff on each factor. *American Ad Mgmt.*, 190 F.3d at 1055 (citing *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1997)). Instead, the Court must balance the factors, giving great weight to the nature of the plaintiff's alleged injury. *Id.*

### a. Antitrust Injury.

The first factor – the nature of plaintiff's alleged injury – requires a showing of "antitrust injury, *i.e.*, injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Knevelbaard*, 232 F.3d at 987 (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)). Parsing the Supreme Court's definition of injury, the Court must find four factors: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent. *See id.* Antitrust injury is harm that "reflect[s] the anticompetitive effect either of the violation or of anticompetitive effects made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

First Data raises a dispute of fact regarding whether it has suffered damages as a result of the alleged wrongful conduct by Visa in enforcing both its point of sale discounts limitation and the ban on intraprocessing. First Data asserts that Visa's conduct, both the ban on

intraprocessing and the regulations barring discounts in addition to other alleged conduct, especially in combination, had the effect of eliminating incentives for members to negotiate bilateral interchange agreements. (SACC ¶ 89; *see also*, *e.g.*, Edlin Decl., Ex. C at ¶¶ 46, 78.) Because the alleged effect of the combination of the intraprocessing ban and the regulations is the limitation of competition among members to outsource their transactional services, First Data contends that it has been harmed in its payment of supra-competitive interchange rates and in its inability to garner further business within the Visa system. (Hausman Decl., Ex. B at ¶ 36.)

First Data also asserts that Visa's conduct led to economic injury because, by setting the ban on intraprocessing and the regulations on point of sale discounts, Visa was able to maintain the supra-competitive interchange fees, and First Data was harmed in the payment of those allegedly inflated fees. (*See* Hausman Decl., Ex. B at ¶ 36.) First Data contends that the evidence demonstrates that the alleged injury flows from that which makes defendants' acts unlawful because Visa's conduct had the effect of stifling competition which would otherwise have increased services business for intraprocessors and reduced the rates acquirers pay for transactions. (*See* Edlin Decl., Ex. C at ¶¶ 46, 78; Shah Decl., Ex. L at 178:8-15.) *See also In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 401 (3d Cir. 2000) (finding antitrust injury where the "excess amount paid by [plaintiffs] not only is 'inextricably intertwined' with the injury [defendant] aimed to inflict, the overcharge was the aim of [defendant's] preclusive conduct. It is difficult to imagine a more formidable demonstration of antitrust injury.") Lastly, First Data's alleged injury is exactly the type the antitrust laws are meant to prevent: "an increase in price resulting from a dampening of competitive forces is assuredly one type of injury for which § 4 potentially offers redress." *McCready*, 457 U.S. at 482.

### b. Directness and Speculative Nature of the Injury.

First Data must demonstrate injury in fact and the claimed injury must be sufficiently direct. There "must be 'not a mere causal link, but a direct effect.'" *Knevelbaard*, 232 F.3d at 989 (quoting *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 268 (3d Cir. 1998)). To assess the directness of the alleged injury, the Court must "look to the chain of causation

9

between [the alleged] injury and the alleged restraint in the market." *American Ad Mgmt.*, 190 F.3d at 1058.  Speculative damages are found where the injury is indirect or "may have been produced by independent factors." *ACG*, 459 U.S. at 542.  It is "appropriate for § 4 purposes 'to consider whether a claim rests at bottom on some abstract conception or speculative measure of harm.'" *Id.* at 543, quoting *McCready*, 457 U.S. at 475, n.11.

First Data alleges, and its experts concur, that the combination of alleged anticompetitive actions by Visa has resulted in the maintenance of inflated interchange fees and reduction in the competition among members to negotiate separate interchange agreements, also resulting in inflation in fees paid by First Data.  Visa has identified no independent factors that may have produced First Data's claimed damages and First Data has alleged that it has paid those inflated interchange fees as a direct result of the enforcement of the ban on intraprocessing in combination with other allegedly anticompetitive conduct including the bar on point of sale discounts.  First Data's experts opine that the damages First Data has suffered were caused directly by the limitation of discounts in combination with Visa's ban on intraprocessing and other, allegedly anticompetitive conduct.  (*See* Edlin Decl., Ex. C at ¶¶ 46, 78; Hausman Decl., Ex. B at ¶ 36.)

The Court finds there is a dispute of fact regarding the directness and speculative nature of the claimed injury.

### c. Risk of Duplicative Recovery and Complexity in Apportioning Damages.

"The indirectness of the alleged injury also implicates the strong interest, identified in our prior cases, in keeping the scope of complex antitrust trials within judicially manageable limits.  These cases have stressed the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *ACG*, 459 U.S. at 543-44.

Visa contends that finding that First Data has antitrust standing would create a potentially serious problem of duplicative recovery because Visa is currently facing suit in New York by merchants, individually or as purported class representatives, who challenge the setting of interchange fees directly as well as aspects of Visa's Honor All Cards regulations.  (Reply at

1  12.) However, this Court is not privy to all of the claims posed by the merchants in the New
2  York action.  There is nothing before this Court to indicate that the merchants seek to challenge
3  either the ban on intraprocessing or the rules limiting point of sale discounts, or the particular
4  combination of alleged activities First Data suggests results in an overcharge in fees.  Further,
5  this Court has previously found that First Data, as an acquirer, has standing to challenge the
6  interchange fees set by Visa.  *See Kendall v. Visa, U.S.A., Inc.*, 2005 U.S. Dist. LEXIS 21450,
7  at *19 (noting that merchant acquirers, rather than merchants, are the proper plaintiffs to sue for
8  the setting of supra-competitive interchange fees).  The Court noted that processing agents for
9  the member banks have standing to sue and specifically took judicial notice of this pending suit.
10 The Court reasoned that, because First Data directly pays the interchange fees and is not a Visa
11 member, it was in the best position to seek redress for the alleged overcharge in fees set by
12 Visa.  Therefore, based on this record, the Court does not conclude that there is a danger of
13 duplicative recoveries.
14        Lastly, First Data's alleged injury is the payment of overcharged fees.  (Hausman Decl.,
15 Ex. B at ¶ 36.)  Because the Court does not find the nature of the alleged injury suffered by First
16 Data to be speculative or exceedingly complicated, or necessarily requiring a complex
17 apportionment of damages, this factor weighs in favor of finding that First Data has antitrust
18 standing.
19        In sum, First Data has raised disputed issues of fact relating to all of the *ACG* factors
20 and therefore supports a finding that First Data has antitrust standing and is a proper plaintiff to
21 bring this suit.  Therefore, Visa's motion for partial summary judgment on the issue of standing
22 to challenge Visa's Honor All Cards and limitations on discounts rules is DENIED.
23 **C.    Visa Contends First Data is Not Entitled to Damages Outside the Relevant Market.**
24        In its counterclaim, First Data claims damages in the amount of processing fee
25 overcharges and lost profits in the network processing market.  (SACC, ¶¶ 82, 100, 111.)
26 However, Visa contends that First Data also seeks to recover for damages allegedly suffered by
27 its overpayment of the inflated interchange fee in its role as an acquirer of Visa transactions.
28 Visa contends that First Data therefore seeks damages in the "systems market" in its role as an

11

1  acquirer of Visa transactions, which differs from the putative network processing market of the
2  underlying claims.  (*See* Motion at 19.)  Visa contends that "an unbroken line of Ninth Circuit
3  authority precludes this attempt to recover damages arising in a market or markets distinct from
4  that in which the antitrust claims are alleged to have occurred."  (*See id.*)

5         The only relevant case cited by Visa for this proposition is *Image Technical Services,*
6  *Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1224 (9th Cir. 1997), in which the Ninth Circuit
7  determined that remand was appropriate where a jury awarded damages in a market that had
8  been dismissed and not adjudicated as unlawful.[3]  In *Kodak*, plaintiffs had alleged that Kodak
9  monopolized the market for servicing copiers as well as the market for used equipment.  The
10 district court had dismissed the used equipment market allegations on the merits, but at trial,
11 when the jury found for plaintiffs on the services market claim, they awarded damages suffered
12 in the used equipment market.  *Id.* at 1223.  On appeal to the Ninth Circuit, plaintiffs argued
13 that the court should assume the jury concluded that plaintiffs had been harmed in the used
14 equipment market from Kodak's monopolization of the services market, rather than Kodak's
15 lawful conduct in the used equipment market.  *Id.* at 1224.  The court correctly rejected the
16 argument, and held that plaintiffs at trial were required to "segregate damages attributable to
17 lawful competition from damages attributable to Kodak's monopolizing conduct" and therefore
18 remanded for a new trial on damages.  *Id.* at 1224  ("the issue presented here:  disaggregation of
19 damages attributable to different acts and suffered in different markets.")  Although the court
20 noted that "conduct found anticompetitive in one market may not be anticompetitive in another
21 market," the court did not find as a matter of law that plaintiffs could not recover damages in
22 the used equipment market if they were proven to be attributable to Kodak's conduct in the
23 services market.  *Id.*

24        Should it pursue recoupment of damages in the form of overpayment of interchange fees
25 and lost profits in the network processing market as an intraprocessor as well as damages

---

[3] Visa also cites *Pool Water Products v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001), which stands for the proposition that private plaintiff can be compensated only for injuries that the antitrust laws were designed to prevent and it is not sufficient merely to assert that one has been damaged by illegal behavior.  This holding does not contribute significantly to the analysis.

12

1  suffered in its role as an acquirer, First Data will have to demonstrate at trial that its harm in its
2  role as acquirer was precipitated by some unlawful conduct in the network processing market.
3  However, the Court cannot conclude as a matter of law that such proof is barred. As currently
4  alleged, First Data's damages in its role as an acquirer are incidental and directly related to the
5  limitation on competition for network processing services.

6  The Court finds the Supreme Court's decision in *McCready* instructive. In *McCready*, a
7  group health plan subscriber who was not reimbursed under her plan for psychotherapy
8  provided by psychologists rather than psychiatrists, brought an antitrust class action against her
9  health insurer, Blue Cross, and an organization of Virginia psychiatrists. *McCready*, 457 U.S.
10 465. The Supreme Court held that although the alleged conspiracy was directed at
11 psychologists and not at subscribers to group health plans, an individual subscriber who
12 suffered damages as the result of the plan's concerted refusal to reimburse could pursue a
13 remedy under Section 4 of the Clayton Act. The Court held that the alleged harm suffered by
14 subscribers was "the very means by which it is alleged that [the plan] sought to achieve its
15 illegal ends." *Id.* at 479. Although the plan argued that the market, for purposes of the alleged
16 conspiracy, was the market in group health plans, the court rejected this construction and held
17 that the individual's claim of injury stemmed from her position as a consumer of psychotherapy
18 services entitled to financial benefits under the plan. *Id.* at 480. The court held that "we think it
19 clear that McCready was 'within that area of the economy . . . endangered by [that] breakdown
20 of competitive conditions' resulting from Blue Shield's selective refusal to reimburse." *Id.* at
21 480-81.

22 Similarly, here, the Court does not find that First Data is barred from recovery of
23 damages allegedly suffered in its position as an acquirer because it has alleged a conspiracy to
24 monopolize in the market of network processing. Such damages, if any, suffered in its role as
25 an acquirer are incidental to such alleged monopolization. The holding in *McCready* permits
26 restraint in one market and resulting, incidental damages to a player in another market. The
27 alleged damages in the form of overpayment of interchange fees are precisely the type of
28 damages caused by the alleged restraint in the alleged operative market. Therefore, Visa's

13

motion for partial summary judgment on the issue of damages outside the relevant market is DENIED.

### D.     First Data's Attempt at Monopolization Claim in the Debit Market.

To prevail on an attempt to monopolize claim, First Data must establish "(1) a specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving 'monopoly power,' and (4) causal antitrust injury." *Rebel Oil Co. v. Atlantic Richfield, Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).  Therefore, in order to prevail on its attempt to monopolize claim, First Data must demonstrate that there is a "dangerous probability" that Visa's challenged conduct will increase its power in the putative relevant market.  Visa argues that with regard to the entire debit card market, even accepting First Data's analyses as true, its ban on intraprocessing would result in the greatest increase of market share of a mere .2 percent, from 53.7 percent to 53.9 percent of the debit market.  Visa thus argues that this slight increase in market share does not amount to evidence that Visa's actions created a dangerous probability that it would obtain or achieve monopoly power in the debit market.  (Motion at 21-22.)  Visa argues that this minimal increase in market share is insufficient as a matter of law to demonstrate a dangerous probability of achieving monopoly power.

In *Rebel Oil*, 51 F.3d at 1438, the appellate court found the district court had erred by finding that a 44 percent market share was insufficient as a matter of law to give ARCO market power.  The court found that "market share of 44 percent is sufficient as a matter of law to support a finding of market power, if entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing." *Id.*  The court commented that courts should be reluctant to apply bright-line rules regarding market share in deciding whether a defendant has market power: "Courts should be 'wary of the numbers game of market percentage' when considering attempt-to-monopolize claims." *Id.* at 1438 n.10 (citations omitted).  The court found that the far wiser approach is to determine fully the issue of market

14

1  power "by carefully analyzing certain telltale factors in the relevant market: market share, entry
2  barriers and the capacity of existing competitors to expand output." *Id.* (citations omitted).[4]

3  As a preliminary matter, First Data disputes the factual premise of Visa's argument.
4  First Data contends that Visa's own documents evidence that, without the ban, it estimated the
5  loss of the share of intraprocessing of Visa transactions at anywhere from 15 percent to 44
6  percent. (*See* Shah Decl., Ex. E at VUFD0000459; Ex. P at VUFD0287036; Ex. Q at
7  VUFD0464228.) In addition, First Data contends that Visa's market share of the entire debit
8  card market is increasing over time. (*See* Edlin Decl., ¶ 28, SACC, ¶ 112, and Opp. at 23
9  (asserting that Visa's market share has increased from approximately 54 percent to closer to 60
10 percent overall).) Therefore, there is significant factual dispute regarding the overall market
11 share gained by Visa by virtue of its conduct in enforcing the ban on intraprocessing.

12 Further, First Data argues that there are disputed issues of material fact regarding Visa's
13 market power (as opposed to merely market share), including entry barriers and the limitations
14 on competitors' capacity to expand. "Barriers to entry may be defined as either 'additional
15 long-run costs that were not incurred by incumbent firms but must be incurred by new entrants,'
16 or 'factors in the market that deter entry while permitting incumbent firms to earn monopoly
17 returns.'" *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427-28 (9th Cir. 1993).
18 First Data points to the findings of the decision in *United States v. Visa, Inc*., 163 F. Supp. 2d
19 322, 340-42 (S.D.N.Y. 2001), in which the district court determined that Visa had market power
20 in the general purpose card network services market. First Data contends that potential
21 competitors in the market in both credit and debit transactions face the same obstacles to entry

---

[4] Visa relies on a case from the Tenth Circuit, *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.*, 885 F.2d 683, 694-95 (10th Cir. 1989), for the proposition that an increase from 41 to 54 percent of market share was insufficient to demonstrate an attempted monopolization claim where there was no chance of illegally increasing the market share beyond that point. The court held there that because of a limitation in contractual rights, there was no dangerous probability that the accused party could infiltrate the market with sufficient market share to be a monopolist. *Id.* at 695. The court specifically found that the "necessarily limited scope of the [accused attempted monopolist's] objective leaves no room for speculation about the probability that [its product] would gain a monopoly." *Id.* Here, in contrast, it is not undisputed that Visa's market share of the entire debit market and therefore its percentage share of the network processing market for debit transactions could increase past the current levels. Therefore, the *Colorado Interstate* opinion is readily distinguishable on the facts.

15

into the market for processing the transactions that result from those cards.  (*See* Opp. at 23 n.17.)  In addition, First Data points to the report of its economic expert who finds that entrants in the network processing market face substantial barriers to entry.  (*See* Edlin Decl., Ex. B at ¶ 170.)  The Court cannot find as a matter of law that there is no dispute of material fact regarding the possibility that Visa, by virtue of its allegedly anticompetitive conduct, maintains market power by creating a marketplace with substantial barriers to entry.

Lastly, the Court finds there is a dispute of fact regarding whether Visa maintains substantial power over price in network processing for debit transactions by preventing First Data from expanding its network processing of Visa transactions and prohibiting others from entering the market.  First Data points to its economic expert's declaration for the proposition that Visa maintains price control by enforcing its ban on intraprocessing of both credit and debit card transactions.  (*See* Edlin Decl., ¶¶ 13, 14, 25, 29.)  The Court again cannot find as a matter of law that this evidence does not create a dispute of material fact regarding Visa's market power over the relevant putative market.  First Data will bear the substantial burden of demonstrating to the jury that Visa possesses market power by virtue of not only its large market share, but also by creating barriers to entry and maintaining substantial power over price in network processing.  But, at this procedural stage, the Court cannot rule that there is no dispute of fact.  Therefore, Visa's motion for partial summary judgment on First Data's third cause of action for attempt to monopolize the debit card network processing services market is DENIED.

**E.     Other Challenged Acts.**

Visa also challenges the allegations in the Second Amended Counterclaim relating to: (1) Visa's Merchant Direct Exchange Program (MDEX); (2) Visa's filing of this lawsuit; (3) Visa's Member Call Program; and (4) Visa's requirement of post-edit logs for arbitration. Essentially, Visa argues that each of these allegations in the counterclaim fail to constitute an independent antitrust violation and therefore requests summary judgment of each.

Visa's attempt to segregate these individual allegations from the overall allegations of competitive conduct is improper.  Visa's arguments unfairly parse First Data's allegations.

16

Parties "should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore*, 370 U.S. at 699 (citations omitted).

> [I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect. At the same time, if all we are shown is a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing. Similarly, a finding of some slight wrongdoing in certain areas need not by itself add up to a violation. We are not dealing with a mathematical equation. We are dealing with what has been called the 'synergistic effect' of the mixture of the elements.

*City of Anaheim v. Southern California Edison Co.*, 955 F.2d 1373, 1376 (9th Cir.1992) (citing *City of Groton v. Connecticut Light & Power Co.,* 662 F.2d 921, 929 (2d Cir.1981)). Visa's challenge by moving for summary judgment on the separate acts as alleged by First Data in its amended counterclaim is improper. Each claimed fact is not a separate cause of action for antitrust violation, but, taken together, the allegations amount to valid claims. The Court cannot determine as a matter of law the character of the overall charges of monopolistic conduct by segregating the alleged conduct into separate, individual acts. On this basis, Visa's motion for summary judgment on the four individual acts as alleged in the counterclaim is DENIED.

## CONCLUSION

Having received the Court's decision on this last in a series of motions for summary judgment, as agreed by the parties at the case management conference held by this Court on December 9, 2005, the parties are HEREBY ORDERED to attend further mediation with Judge Eugene F. Lynch to be completed by no later than 30 days after receipt of this Order. Should the parties or the mediator require further time to complete mediation, upon a showing of good cause, the Court would be amenable to an extension of time.

////
////
////
////
////

In the event such mediation proves fruitless, however, the Court HEREBY SETS the following dates:

- Pretrial submissions shall be due on December 15, 2006;
- Pretrial conference shall be held on January 16, 2007 at 2:00 p.m.;
- Jury selection shall commence on February 7, 2007 at 8:30 a.m.;
- Jury trial shall commence on February 12, 2007 at 8:30 a.m.; and
- The parties' internal deadlines shall flow from the pretrial conference date as ordered at the case management conference.

**IT IS SO ORDERED.**

Dated: May 12, 2006

*Jeffrey S. White*
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE